[No. C008798. Third Dist. Oct. 1, 1991.]

LIVE OAK PUBLISHING COMPANY, INC., et al., Plaintiffs and
Appellants, v.
GLADYS COHAGAN, Defendant and Respondent.

COUNSEL

Meyer & Mitchell, Daniel L. Mitchell, Jack Leavitt, Damrell, Nelson & Schrimp, Roger M. Schrimp and Debra A. Hayes for Plaintiffs and Appellants.

Brown, Hall, Spatola, Clair & McKinley, Charles R. Spatola and Steven A. Clair for Defendant and Respondent.

OPINION

**CARR, Acting P. J.**—In this man-bites-dog story, plaintiff newspaper sued an individual for libel and slander. The trial court sustained a demurrer without leave to amend as to the libel cause of action and granted summary judgment as to the slander cause of action. We shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 25, 1988, the Escalon Times, a small-town newspaper, published articles about each candidate for a local election. The article about candidate Victoria Royster was obviously garbled. Gladys Cohagan (Cohagan), a

Royster supporter, wrote a letter to the newspaper accusing it of intentionally garbling the article, presumably to influence the outcome of the election. Cohagan included a check to cover the cost of printing her letter as a full-page advertisement. The paper kept her money and printed her letter as an advertisement. Plaintiffs Live Oak Publishing Company, Inc., a California corporation doing business as the Escalon Times, Stanley L. Cook, owner and publisher, Williams P. Camp, general manager, Richard Myers, editor, and Tom Mauldin, managing editor (collectively Live Oak) sued Cohagan for libel. The paper also sued for slander, based on statements Cohagan made to employees of the paper. The court sustained Cohagan's demurrer without leave to amend as to the libel cause of action on the ground Live Oak itself published the libel. Live Oak was given leave to amend the slander cause of action.

Live Oak filed a first amended complaint against Cohagan, realleging both causes of action. Cohagan again demurred and the court overruled the demurrer. Apparently recognizing the impropriety of restating the libel cause of action (Code Civ. Proc., § 436), Live Oak declined to pursue this as a viable cause of action and appeals from the dismissal entered as to the cause of action after the sustaining of the demurrer.[1]

Cohagan moved for summary judgment on the slander cause of action on the ground the statements were protected opinion statements and that there had been no publication of the statements to third parties. Supplemental papers urged Live Oak was a public figure and there was no evidence of actual malice. The motion was granted on this latter ground. Reconsideration was denied.

Live Oak's briefs present issues in a confusing order which we do not attempt to follow.[2] We shall first review the order sustaining the demurrer to the libel cause of action, then we shall review the order granting summary judgment as to slander.

---

[1]Live Oak filed a notice of appeal from the order granting summary judgment. We dismissed the appeal as a nonappealable order. (See *Foremost Ins. Co.* v. *Wilks* (1988) 206 Cal.App.3d 251, 255, fn. 2 [253 Cal.Rptr. 596].) Eventually Cohagan had a judgment entered and Live Oak filed a proper notice of appeal.

[2]Live Oak's reference to a matter not reflected in the record which occurred after the filing of the notice of appeal, a television program about this suit, is improper and we disregard it. (Cal. Rules of Court, rules 13, 18.) We also disregard Cohagan's reference to a possible malicious prosecution suit for the alleged SLAPP, or Strategic Lawsuit Against Public Participation.

## I. THE LIBEL CAUSE OF ACTION.

### A. *The Standard of Review.*

A general demurrer admits the truth of all material facts alleged in the complaint. If there is a reasonable possibility the defect can be cured the plaintiffs should be given leave to amend. (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 936 [231 Cal.Rptr. 748, 727 P.2d 1029].) If there can be no liability as a matter of law the demurrer should be sustained without leave to amend. (*Lawrence v. Bank of America* (1985) 163 Cal.App.3d 431, 436-437 [209 Cal.Rptr. 541].) As Live Oak was given no leave to amend the libel cause of action in the original complaint, the adequacy of that cause of action may be tested here. (*Seidner v. 1551 Greenfield Owners Assn.* (1980) 108 Cal.App.3d. 895, 901 [166 Cal.Rptr. 803].)

### B. *Discussion.*

The trial court ruled Live Oak could not sue for libel as *it* had published the allegedly defamatory statement. The demurrer also raised the question of whether the statements were statements of opinion protected under the First Amendment, an issue we do not reach because of our ruling on the publication issue. (But see *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, __ [111 L.Ed.2d 1, 19, 110 S.Ct. 2695] [no separate privilege for statements of opinion under First Amendment].)

"Libel is a false and unprivileged publication by writing, . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) An entity other than a natural person may be libeled. (*Di Giorgio Fruit Corp. v. AFL-CIO* (1963) 215 Cal.App.2d 560, 570-571 [30 Cal.Rptr. 350].)

Typically it is the newspaper which seeks protection from liability for printing a letter to the editor. (E.g., Annot. (1980) 99 A.L.R.3d 573.) But this is not the first time a newspaper or its agents have brought suit for defamation. (E.g., *Earl v. Times-Mirror Co.* (1921) 185 Cal. 165 [196 P. 57] [publisher and owner], see Gatley on Libel and Slander (7th ed. 1974) § 64, p. 34 and fn. 17, § 73, pp. 39-40; Odgers, A Digest of the Law of Libel and Slander (5th ed. 1911) pp. 30-31 [journalists, newspaper proprietors]; Wittenberg, Dangerous Words (1947) p. 296 [listing adjudicated libels of editors]; pp. 301-302, 303 [publishing company].)

An advertisement may be held libelous. (*Farr v. Bramblett* (1955) 132 Cal.App.2d 36, 43 [281 P.2d 372] [advertisement alleging communism

subject to retraction provisions of Civ. Code, § 48a]. See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R.2d 1412] [political advertisement held protected absent actual malice].)

■ However, a libelous statement is not actionable until it has been published to a third person. (Prosser on Torts (5th ed. 1984) Defamation, § 113, pp. 797-799.) A plaintiff cannot manufacture a defamation cause of action by publishing the statements to third persons; the publication must be done by the defendant. (*Shoemaker v. Friedberg* (1947) 80 Cal.App.2d 911, 916 [183 P.2d 318] [plaintiff repeated statement, no publication]. Cf. *Hellar v. Bianco* (1952) 111 Cal.App.2d 424 [244 P.2d 757, 28 A.L.R.2d 1451] [defendant allowed statement to remain on the men's room wall, publication].)

There is an exception to this rule. When it was foreseeable that a defendant's act would result in publication to a third person, the plaintiff may maintain a libel action. (*Schneider v. United Airlines, Inc.* (1989) 208 Cal.App.3d 71, 75 [256 Cal.Rptr. 71] [defendant liable for foreseeable republication by third party]; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 478b, p. 562.) In the leading case of *Hedgpeth v. Coleman* (1922) 183 N.C. 309 [111 S.E. 517], a young boy received a letter accusing him of theft. The court held the sender of the letter must have foreseen the boy would show it to his family. "The sending of libelous matter to a person known by the sender to be blind, or having sight, to be unable to read, and therefore obliged to have it read by another, is when read, a publication by the sender, because such exposure of the subject-matter is the proximate result of the writing and sending of the communication. [Citations.] These exceptions are based upon the principle that the act of disclosure arises from necessity. But necessity is not predicated exclusively on conditions which are physical. Necessity may be superinduced by a fear which is akin to duress. A threat may operate so powerfully upon the mind of an immature boy as to amount to coercion; and when an act is done through coercion it is not voluntary." (*Id.* at pp. 313-314 [111 S.E. at 520]; see also *Bretz v. Mayer* (1963) 1 Ohio Misc. 59 [203 N.E.2d 665, 670-671] [letter to clergyman threatening existence of new schismatic church].)

The "coercion" aspect of the exception applies "where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person *after* he has read it or been informed of its contents. [Citations.]" (*McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787, 796 [168 Cal.Rptr. 89].)

"The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed." (*McKinney, supra,* 110 Cal.App.3d at pp. 797-798, cited in *Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268, 281 [208 Cal.Rptr. 152, 690 P.2d 625].)

This exception has been limited to a narrow class of cases, usually where a plaintiff is compelled to republish the statements in aid of disproving them. Thus, where a derogatory statement is placed in a personnel file, the employee must explain the statement to subsequent employers, who will surely learn of it if they investigate his or her past employment. (*McKinney, supra,* 110 Cal.App.3d at p. 795; *Churchey* v. *Adolph Coors Co.* (Colo. 1988) 759 P.2d 1336, 1344-1345 [adopting *McKinney* rule]; *Lewis* v. *Equitable Life Assur. Soc.* (Minn. 1986) 389 N.W.2d 876, 886-888 [62 A.L.R.4th 581] [collecting cases]; *Colonial Stores* v. *Barrett* (1946) 73 Ga.App. 839 [38 S.E.2d 306, 307-308] [under wartime regulations worker was required to present his certificate of separation to prospective employers; thus former employer knew defamatory statements placed on the certificate would be republished]. See also Prosser, *supra,* § 113, p. 802; Annot. (1988) 62 A.L.R.4th 616.) Similarly, when an unfavorable statement is placed in a person's credit report the person must explain the statement in order to obtain credit. (Cf. *Belcher* v. *Little* (Iowa 1982) 315 N.W.2d 734 [adopts *McKinney* rule, question of fact whether plaintiffs were compelled to publish defendant's claim of interest in their property].)

To determine if the "coercion" exception is applicable, the test, as prescribed by Prosser is whether "because of some necessity he was under to communicate the matter to others, it was reasonably to be anticipated that he would do so[.]" (Prosser, *supra,* § 113, p. 802.) Cohagan foresaw the publication of the statement, as she demanded it be published and paid almost $600 to ensure Live Oak would publish it. The question then is whether Live Oak was under some "necessity" to publish; whether Live Oak was compelled to publish the statement.

■ Live Oak makes no claim it was required by law to publish the advertisement. The issue is whether, as a practical matter, Live Oak was under a compulsion to publish the article which was so strong that it could not reasonably have refused.

The only fact from the original complaint relating to compulsion is that Cohagan "demanded" that the letter be published. This was insufficient as a matter of law, and the real question is whether the complaint could have been amended to state facts establishing the requisite compulsion.

Code of Civil Procedure section 472c permits an appellant to propose an amendment to a complaint on appeal, even if such amendment was not proffered to the trial court when a demurrer was sustained without leave. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 951, pp. 384-385.) Live Oak has set out the factual amendments to the original complaint it would make if given leave:

"c.  In Cohagan's view, the *Escalon Times* would refuse to print the facts about the garbled Royster interview if the newspaper had any choice in the matter;

"d.  By exerting pressure on the newspaper and by insisting that her letter run, unedited, as a paid advertisement, Cohagan placed the newspaper in an untenable position;

"e.  If the *Escalon Times* published the Cohagan letter, unedited, its readership would be presented with supposed facts about its purportedly deliberate acts of sabotage;

"f.  If the *Escalon Times* refused to run the letter, unedited, the newspaper's actions would prove its deliberate culpability, in the minds of Cohagan and her supporters, and would establish the newspaper as untrustworthy;

"g.  Under the circumstances, the *Escalon Times* felt compelled to publish the Cohagan letter since publication of the defamatory material prevented Cohagan from spreading other, potentially more serious defamatory statements about the newspaper's editorial policies;

"h.  Cohagan foresaw that the *Escalon Times* would feel compelled to disclose her defamatory statements and created the circumstances which made the compulsion irresistible for all practical purposes;

"i.  The *Escalon Times* published the defamatory material reluctantly, yielding only because of the compulsion which Cohagan had created[.]"

The totality of these "facts" amounts to an argument that Live Oak acted reasonably in publishing the letter. It does not establish why it was compelled to publish the letter. Assuming "the minds of Cohagan and her

supporters" were important to Live Oak it could simply have printed an article explaining Cohagan's views and Live Oak's response and returned the advertisement and the money to Cohagan.

This is not a situation in which the statement would go unrebutted if Live Oak refused to publish the defamatory statement. Live Oak could print an article contesting the accuracy of Cohagan's assertions if she made them from another forum. In stark contrast is the sort of situation presented by *McKinney, supra,* wherein a job seeker must tell a prospective employer what is in his personnel file in order to explain away a negative job reference. In that situation there is no alternative but for the plaintiff to republish the defamation.

These "facts" do not bring Live Oak within the coerced republication rule. Since Live Oak published the defamatory statements itself, it cannot state a cause of action against Cohagan for libel. It is self-axiomatic that a person cannot sue himself or herself. (*Lodi* v. *Lodi* (1985) 173 Cal.App.3d 628, 631 [219 Cal.Rptr. 116].) The court properly sustained the demurrer.

## II. THE SLANDER CAUSE OF ACTION

The first amended complaint alleged Cohagan made the following oral statements: ". . . that Plaintiff intentionally sabotaged Victoria Royster, that Plaintiffs intentionally crucified Victoria Royster, and that Plaintiffs were lying to Defendant GLADYS COHAGAN."

The motion for summary judgment as to slander was granted because (1) the statements were opinion statements and (2) Live Oak was a public figure, and therefore had to show the statements were made with malice, which had to be proven by clear and convincing evidence. We need only address the latter ruling, as that is dispositive. (*Charpentier* v. *Von Geldern* (1987) 191 Cal.App.3d 101, 107 [236 Cal.Rptr. 233].)

A defendant who moves for summary judgment "must conclusively negate a necessary element of the plaintiff's case, and demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

The normal scope of appellate review of a summary judgment motion involves the same three-step analysis required of the trial court:

"First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete

defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.]

"Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] . . .

"[T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" *(AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

██ However, when the plaintiff in a defamation case is a public figure he or she must show actual malice, and the standard of review of a summary judgment motion is modified: "It is pointless to declare in the abstract that summary judgment is a favored or disfavored remedy. A more subtle analysis is required—one that explains how a motion for summary judgment should be decided in a defamation case under the *New York Times* test. . . . '[T]he standard of review of First Amendment defamation actions, as in all summary judgment cases, is whether the record, construed in a light most favorable to the party against whom the judgment has been entered, demonstrates there are genuine issues of fact which, if proven, would support a jury verdict for that party. Since, however, a jury verdict in a defamation case can only be supported when the actual malice is shown by clear and convincing evidence, rather than by a preponderance of evidence as in most other cases, [citation], the evidence and all the inferences which can reasonably be drawn from it must meet the higher standard." *(Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252 [208 Cal.Rptr. 137, 690 P.2d 610]. See *Anderson v. Liberty Lobby, Inc.* (1986) 477 U.S. 242, 256-257 [91 L.Ed.2d 202, 216-217, 106 S.Ct. 2505]; *Good Government Group of Seal Beach, Inc. v. Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; *Miller v. Nestande* (1987) 192 Cal.App.3d 191, 196 [237 Cal.Rptr. 359, 62 A.L.R.4th 301]; *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 634-635 [188 Cal.Rptr. 216].) If there is insufficient evidence to sustain a finding of malice a trial is not warranted.

" 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.' " *(Reader's Digest, supra,* 37 Cal.3d at pp. 256-257, quoting *St. Amant v. Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323]; see *Planned Protective Services, Inc. v. Gorton* (1988) 200 Cal.App.3d 1, 8-9 [245 Cal.Rptr. 790].)

■ The first question to be determined is whether Live Oak is a public figure.

## A.

· ■ "As a general rule, public officials and figures can be said to have voluntarily exposed themselves to public scrutiny and must accept the consequences. . . . [¶] . . . A person is not a public figure merely because he happens to be involved in a controversy that is newsworthy. [Citation.] '[A] "public figure" plaintiff must have undertaken some *voluntary* act through which he seeks to influence the resolution of the public issues involved. As such, the mere involvement of a person in a matter which the media deems to be of interest to the public does not, in and of itself, require that such a person become a public figure for the purpose of a subsequent libel action. [¶] In sum, when called upon to make a determination of public figure status, courts should look for evidence of affirmative actions by which purported "public figures" have thrust themselves into the forefront of particular public controversies.' " (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 744 [257 Cal.Rptr. 708, 771 P.2d 406]. See *Kaufman* v. *Fidelity Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 913, 920 [189 Cal.Rptr. 818].)

Generally, authors are considered to have "participated sufficiently in public controversies or . . . otherwise involved themselves in matters of public concern as to be public figures . . . ." (Annot. (1977) 75 A.L.R.3d 616, 628 [collecting cases].) In *Hoffman* v. *Washington Post Co.* (D.D.C. 1977) 433 F.Supp. 600 (affd. without opn. (1978) 578 F.2d 442), the plaintiff was held to be a public figure partly because he "achieved his admitted prominence in the field of protein supplements by serving as editor and publisher of *Strength and Health* magazine since 1932 and by writing at least 67 books . . . ." (*Id.* at p. 604.) The plaintiff "voluntarily injected himself into this public controversy [regarding protein supplements]." (*Ibid.*) In *Warner* v. *Kansas City Star Co.* (Mo.Ct.App. 1987) 726 S.W.2d 384, it was held (at p. 385) that the former editor of a newspaper's outdoor section was a limited purpose public figure. He wrote many articles and was well known to the newspaper's readers. (*Ibid.*) In the *Liberty Lobby* case, one way in which the district court found that Liberty Lobby participated in public affairs was that it "publishes a newspaper, and broadcasts its radio commentary and television news show." (*Liberty Lobby, Inc.* v. *Anderson* (1983) 562 F.Supp. 201, 208. See *Anderson* v. *Liberty Lobby Inc., supra,* 477 U.S. at p. 246, fn. 3 [91 L.Ed.2d at p. 210].)

The basis for these rulings is that an author, and especially a newspaper, often acts with the purpose of fostering public debate. " 'The Constitution

specifically selected the press . . . to play an important role in the discussion of public affairs. Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve.' " (*McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 859 [231 Cal.Rptr. 518, 727 P.2d 711], quoting *Mills* v. *Alabama* (1966) 384 U.S. 214, 219 [16 L.Ed.2d 484, 488, 86 S.Ct. 1434].) A newspaper is uniquely possessed of "sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements. [Citation.]" (*Curtis Publishing* v. *Butts* (1976) 388 U.S. 130, 155, see *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 344 [41 L.Ed.2d 789, 808, 94 S.Ct. 2997].)

On appeal Live Oak appears to concede Live Oak Publishing Company is a public figure, but seeks separate treatment for the individual plaintiffs, the managerial employees of the company. Live Oak cites *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14], page 769, wherein the court stated: "Merely doing business with parties to a public controversy does not elevate one to public figure status." But these managerial individuals did not "do business" with the newspaper, as Live Oak urges; they operated the newspaper. The owner and publisher, general manager and editors of the Escalon Times are intimately involved in public political debate in their community and the community has a legitimate and substantial interest in their conduct regarding the operation of the newspaper. (See *Milkovich, supra,* 111 L.Ed.2d at p. 15.) We do not believe these plaintiffs were "more vulnerable to injury," justifying any special protection. (Cf. *Carney* v. *Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1016 [271 Cal.Rptr. 30].) They, too, are public figures.

### B.

The next question to be determined is whether Live Oak can produce clear and convincing evidence of actual malice at trial. Constitutional "actual" malice is "subjective in nature, provable only by evidence that the defendant 'realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement.' [Citations.] Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing. Only the existence of 'sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity" ' will suffice to meet the subjective test." (*Newton* v. *National Broadcasting Co., Inc.* (9th Cir. 1990) 930 F.2d 662, 668-669.)

Since this appeal is from a grant of summary judgment, the initial issue is whether Cohagan established her "lack of any serious doubt as to the truthfulness" of her statements. (*Miller* v. *Nestande, supra*, 192 Cal.App.3d at p. 197.)

The pleadings are in disarray. Since the major thrust of the motion was to establish that no slanderous statements were ever made, Cohagan's statement of undisputed facts does not establish Live Oak's inability to prove malice. However, Cohagan did file a declaration stating she was active in the Royster campaign and had donated and loaned the campaign over $6,000. She declared the reason she contacted the Escalon Times "was because the article [about Royster] was extremely garbled with many misspelled words and many words which were out of context. [¶] It was my opinion that article showed Victoria Royster in a very poor light as compared to the articles which accompanied this garbled article . . . . [¶] Because of the time that I expended in the campaign and the monies I have expended in both contributions and a loan to the campaign, I was very disturbed by the extremely poor quality of the text of the interview with Victoria Royster." She urged Live Oak could not show malice.

This declaration is minimally sufficient. It establishes that, assuming the verbal statements attributed to Cohagan were made, they were made because Cohagan believed them. This means Live Oak could not prove actual malice, and Cohagan, as the movant, established her prima facie case for summary judgment. Live Oak suggests that since the best proof of malice is the defendant's state of mind, "her untested proclamation of innocence cries out for cross-examination." Live Oak misses the point of a summary judgment motion in a defamation case. If Live Oak is a public figure, the issue is whether Live Oak can produce clear and convincing evidence of actual malice at trial, not whether actual malice existed.

We look to Live Oak's opposition to discover any conflicting evidence of malice. There is no such evidence.

Throughout Live Oak's brief are references to Live Oak's inability to complete discovery prior to the hearing on the summary judgment motion. As no claim of error is predicated on this point as evidenced by the failure to separately head an argument on it as required by California Rules of Court, rule 15, we disregard these references. (*Utz* v. *Aureguy* (1952) 109 Cal.App.2d 803, 807 [241 P.2d 639].)

The only direct evidence on the issue of malice produced below was Royster's deposition testimony. At best this testimony established that Cohagan bore animosity towards the Escalon Times. But ill will toward the

plaintiff is not "actual malice." (*McCoy* v. *Hearst, supra,* 42 Cal.3d at p. 872.) It is true that evidence of ill will may be circumstantial evidence of actual malice. (*Reader's Digest, supra,* 37 Cal.3d at pp. 257-258.) But, as in the very authority cited by Live Oak, the defendants failed to establish any link between Cohagan's hostility to the paper and her awareness of the probable falsity of her statements. (*Fletcher* v. *San Jose Mercury News* (1989) 216 Cal.App.3d 172, 186 [264 Cal.Rptr. 699].)

Further, Royster testified in deposition that she herself thought some of her statements were misstated by the paper, not merely typographically misprinted, and she mentioned this to Cohagan. When Royster saw the article she thought the paper had acted intentionally. Royster also testified that a citizen accosted her on the street to say "that the Escalon Times must think we're stupid, the readers are stupid." Two other persons told Royster the paper had acted intentionally. This suggests Cohagan was not the only person in the community who entertained an honest belief that the newspaper intentionally misprinted the article. Cohagan was "quite upset about the whole situation." As Royster put it, "in a campaign I think you get to a point where you feel a lot is intentional and you take things very personal, no matter who you are, whether a candidate or a supporter."

Citing *Reader's Digest, supra,* Live Oak urges there was circumstantial evidence that Cohagan did not believe her statements. "*Reader's Digest* (at pp. 257-258) points out actual malice can be proven by circumstantial evidence such as failure to investigate, anger and hostility toward the defendant [*sic*] or reliance on sources known to be unreliable or biased against the plaintiff." (*Planned Protective Services, supra,* 200 Cal.App.3d at p. 10.) Live Oak points to two pieces of evidence. The first is that Cohagan disregarded the explanation for the misprints given to her by the newspaper. The second is that she disregarded Royster's suggestion that she phrase her statements in opinion form.

However, "such evidence is relevant only to the extent that it reflects on the subjective attitude of the publisher. [Citations.] The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]" (*Reader's Digest, supra,* 37 Cal.3d at p. 258.)

The pieces of evidence noted by Live Oak, singly or in combination, prove nothing about Cohagan's malice. Indeed, it could be urged plausibly that each demonstrates the sincerity of her belief that the newspaper was dishonest: If she believed this, she would not have believed the explanation

she was given for the misprints, and she would believe it was not necessary to express her belief in the form of an opinion. In fact, Royster's deposition testimony reflects that after Royster suggested that Cohagan word the letter in the form of an opinion, Cohagan's response was "that the letter was her feelings." It further reflects that after the paper informed Royster the article would be corrected and reprinted, she informed the paper that "after the way things have happened, I would have to see it to believe it." Thus even Royster rejected the newspaper's explanation.

We do not believe this speculation by Live Oak raises a triable issue of fact. Royster's deposition testimony, when read in its entirety, does not contain clear and convincing evidence on the issue of Cohagan's state of mind to show that she "entertained serious doubts as to the truth" of her statements or that they were "so inherently improbable that only a reckless [person] would have put them in circulation." (*Reader's Digest, supra,* 37 Cal.3d at pp. 256, 257.)

## CONCLUSION

The demurrer on the libel cause of action was properly sustained because Live Oak voluntarily published the allegedly defamatory statements. Live Oak and its managerial employees are public-figure plaintiffs and thus must prove actual malice by clear and convincing evidence. Live Oak did not introduce such evidence in opposition to the summary judgment motion. As Cohagan presented a prima facie case for summary judgment, Live Oak's failure to produce opposing evidence is fatal to its cause of action for slander.

## DISPOSITION

The judgment is affirmed.

Davis, J., and Nicholson, J., concurred.