Opinion
 

 DABNEY, Acting P. J.
 

 Plaintiff and appellant Charles John “Chuck” Davis, Sr., appeals after the trial court granted summary judgment in favor of defendant Consolidated Freightways (CF) and other defendants in plaintiff’s action arising out of plaintiffs alleged wrongful termination by CF, his former employer.
 
 [1]
 
 We conclude plaintiff failed to raise triable issues of material fact concerning the fundamental elements of his causes of action and that summary judgment was proper. Accordingly, we affirm the judgment below.
 

 Facts
 

 In skeletal form, the facts are these: plaintiff Chuck Davis had worked for CF for about 10 years. At the time of the incidents herein he was the manager of a major freight consolidation terminal for CF. Plaintiff performed competently, and had received regular merit increases and promotions.
 

 On November 22, 1989, plaintiff went into a storage lock-up to put away some equipment. When plaintiff came out of the lockup, he was carrying a
 
 *359
 
 jacket wrapped in clear plastic. Plaintiff displayed the jacket to another employee and told her it was a safety award. CF did make such items as jackets available as awards to employees, and plaintiff had in fact placed an order some time before November 22, 1989, for an award jacket he had earned. In fact, the jacket plaintiff took from the lockup was “distressed freight”—i.e., part of a customer’s freight that had been separated from a larger shipment. CF holds such distressed freight in a storage area until its proper destination is determined. CF undertook an investigation of the matter and decided plaintiff had stolen the jacket from distressed freight. Plaintiff was thereafter terminated.
 

 Plaintiff sued for wrongful termination, alleging causes of action for breach of an implied contract not to terminate except for good cause, wrongful termination in violation of fundamental public policy (alleging plaintiff had been fired for refusing to take a polygraph examination), and defamation (alleging CF published statements that plaintiff had been fired for theft). CF moved for summary judgment on all causes of action. The trial court granted the motion and dismissed plaintiffs complaint.
 

 Further detailed facts will be set forth in connection with the discussion of the summary judgment motion.
 

 Discussion
 

 Plaintiff contends there were triable issues of fact (1) whether an implied contract of employment existed, (2) whether CF terminated plaintiff because of a good faith belief he had committed theft, (3) whether plaintiff was terminated because he did not take and pass a polygraph examination, and (4) whether CF defamed plaintiff. CF, of course, contends otherwise. We begin, of course, with the familiar recitation that “[t]he summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution.
 
 (Eagle Oil & Ref. Co.
 
 v.
 
 Prentice
 
 (1942) 19 Cal.2d 553, 556 [122 P.2d 264].) Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried. (Code Civ. Proc., § 437c;
 
 Lipson
 
 v.
 
 Superior Court
 
 (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].)
 

 “ ‘The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.’
 
 (Lipson
 
 v.
 
 Superior Court, supra,
 
 31 Cal.3d at p. 374.) ‘The affidavits of the moving party are strictly construed and those of [the] opponent liberally construed, and doubts as to the propriety of summary
 
 *360
 
 judgment should be resolved against granting the motion.’
 
 (Slobojan
 
 v.
 
 Western Travelers Life Ins. Co.
 
 (1969) 70 Cal.2d 432, 436 [74 Cal.Rptr. 895, 450 P.2d 271].) ‘. . . [I]ssue finding rather than issue determination is the pivot upon which the summary judgment law turns.’
 
 (Walsh
 
 v.
 
 Walsh
 
 (1941) 18 Cal.2d 439, 441 [116 P.2d 62].)”
 
 (Mann
 
 v.
 
 Cracchiolo
 
 (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134].)
 

 Both the trial court and the appellate court apply these principles to summary judgment. On appeal, however, the appellate court conducts an independent review of the trial court’s resolution of questions of law.
 
 (Elene H.
 
 v.
 
 County of Los Angeles
 
 (1990) 220 Cal.App.3d 1445, 1451 [269 Cal.Rptr. 783];
 
 Olson
 
 v.
 
 Federal Ins. Co.
 
 (1990) 219 Cal.App.3d 252, 260 [268 Cal.Rptr. 90].) With these principles in mind, we turn to plaintiffs appeal.
 

 I.
 
 Implied Contract
 

 A. Agreed Undisputed Facts
 

 CF’s moving papers asserted that plaintiff’s employment was terminable at will by either party; in other words, there was no implied contract to terminate only for good cause. Among other things, CF asserted:
 

 “77. In 1981, [when plaintiff was first employed as a manager by CF] Plaintiff Chuck Davis (“Plaintiff’) attended management training sessions in which [CF] discussed its ‘at will’ policy and its impact on hiring, disciplining, and terminating non-bargaining unit employees.
 

 “78. Some time between July 1987 and December 1, 1989, when Plaintiff was Group Operations Manager of the Mira Loma Consolidation Center, Plaintiff attended one or two Group Operations Managers’ Meetings, attended by Group Operations Managers nationwide, at which current legal issues were discussed, including CF’s ‘at will’ employment policy.
 

 “79. In or about March 1985, . . . [CF] included language concerning its ‘at will’ employment policy in . . .the Administrative Manual.
 

 “80. Also in or about March 1985, [CF] added ‘at will’ language to its Application for Employment.
 

 “82. The CF Administrative Manual was developed to serve as a guideline and reference tool for managers nationwide to use to implement [CF] policies and procedures.
 

 
 *361
 
 “83. Plaintiff first knew of the existence of the Administrative Manual and its purpose when he [undertook] his first job with CF.
 

 “84. Plaintiff understood that the Administrative Manual contains [CF’s] personnel policies and procedures governing all non-bargaining unit employees, including management employees such as Plaintiff.
 

 “85. Line managers, such as Plaintiff, were expressly responsible for being knowledgeable about and implementing the policies and procedures contained in the Administrative Manual.
 

 “86. As a Terminal Manager, Plaintiff was responsible for updating the Administrative Manual with policy revisions ....
 

 “87. Plaintiff never saw any written CF policies requiring good cause for the termination of non-bargaining unit employees.
 

 “88. Employment decisions involving bargaining unit employees were governed entirely by the union contract, which Plaintiff admitted affords greater protections to those employees than are afforded to non-bargaining unit employees, such as Plaintiff.
 

 “89. Throughout his employment with CF, Plaintiff believed that [CF] regularly terminated employees without ‘cause’ and that managers had the discretion to terminate employees without notice.”
 

 These alleged undisputed facts were supported by declarations of CF officials, including Thomas Paulsen, the western area vice-president for CF, defendant Don Lemons, a division manager and plaintiff’s immediate supervisor, Brian Tierney, a high-level human resources executive for CF, and David Benak, CF’s central area personnel manager. Plaintiffs responsive papers conceded that all the above facts were undisputed.
 

 B.
 
 Disputed “Undisputed” Facts
 

 CF also claimed as undisputed facts that CF had always had an at-will employment policy for nonunion employees, and that the purpose of adding “at will” language to the administrative manual and to the employment application was to make express what had already been CF’s policy.
 

 1.
 
 CF’s Moving Papers.
 

 CF cited supporting declarations to substantiate its “at will” employment policy:
 

 
 *362
 
 Thomas Paulsen, the western area vice-president for CF, declared that he had worked in management positions for CF for 26 years. As a manager, it was his duty to be familiar with CF policies and procedures. He was aware at the time he was hired in 1966 that “CF’s policy was, and is, that non-bargaining unit employees, including supervisors and managers at all levels, could be terminated at any time, for any reason, with or without cause.”
 

 Don Lemons, a division manager and plaintiff’s former supervisor at CF, had been a management employee for CF for 15 years. He knew since he was hired in 1974 that CF’s policy for nonunion employees was that they could be terminated at any time, for any reason, with or without cause.
 

 Brian Tierney, the director of human resources for CF, had been responsible for developing, administering and implementing CF’s personnel policies and procedures for non-bargaining unit employees. His job required him to be familiar with all CF policies and procedures, both past and present. It was his understanding that CF had always been an at-will employer, and that its nonbargaining unit employees could be terminated at any time, for any reason, with or without cause.
 

 In contrast, bargaining (union) employees could not be terminated immediately,
 
 except for certain offenses specified in the collective bargaining agreement—such as
 
 theft—and termination of union employees required pretermination procedures, such as warnings, under the collective bargaining agreement.
 

 In March 1985, CF added “at will” policy to its administrative manual. The administrative manual required managers like plaintiff to implement CF’s personnel policies. The administrative manual applies to all non-bargaining unit employees. Managers are responsible for maintaining and updating their administrative manuals and must “sign off’ additions placed in the manual.
 

 CF included the “at will” policy in the manual in 1985 “because of the advent... of wrongful termination litigation.” The purpose of adding the “at will” language to the administrative manual and CF’s employment application “was to make express and to reinforce what had always been a CF policy and to ensure that all employees, including the managers required to implement the policies, were aware of that policy.”
 

 David Benak, a CF personnel manager, averred that he had held positions in personnel and human resources at CF for 22 years. He conducted employee training programs for supervisory employees on hiring, discipline
 
 *363
 
 and termination of both union and nonunion employees. His job required him to be familiar with CF’s personnel policies and practices; he had been told that CF had always been an “at will" employer with respect to nonbargaining unit employees, and that supervisors and managers could be terminated at any time, for any reason, with or without cause.
 

 Benak trains other CF managers in CF’s at-will policies, including how to “avoid creating, at any phase of the employment process, an implied contract of employment.” Benak personally conducted such training at the terminal managers’ training conference, a mandatory program for all CF managers. “At will” employment issues are addressed routinely in CF’s management training courses. Plaintiff’s personnel record shows he had attended several of these CF training courses.
 

 2.
 
 Plaintiff’s Opposition.
 

 [2]
 

 Plaintiff disputed the asserted facts that CF’s policy had always been at-will employment for nonunionized management personnel and that the at-will language had been added to the administrative manual in 1985 to make the at-will policy express. Plaintiff’s counter-showing relied exclusively on selected portions of his own deposition testimony:
 

 Plaintiff testified that terminal managers and freight operations managers “could make decisions to terminate people. However, the CF policy was that one level of management above another level could not make that decision on its own. He had to go to that second tier up to secure authority to do so. And then what it did is it avoided emotional types of decisions to terminate someone.
 

 “The emphasis at [CF] was that if you are going to terminate someone, you had to build a file,
 
 especially if he was over a certain age,
 
 ... but you must have a layered type of documented file before you could terminate anyone.” (Italics added.) Don Lemons (the division manager and plaintiffs supervisor) would have had to consult Paulsen, the western area vice-president, before firing a senior manager such as a freight operations manager. Plaintiff testified that “just about every decision on personnel at that level above had to be cleared through Paulsen.” Lemons would have consulted Paulsen about “[a]lmost all of the things that affected the Mira Loma operation . . . .” Plaintiff never consulted his administrative manual to find out CF’s policy on severance pay “or anything of that nature.”
 

 
 *364
 
 Plaintiff further testified that he believed he had a contract of employment with CF. Plaintiff believed the terms of that employment were that “as long as I was a productive employee doing a good job for the company, that I had employment.” Plaintiff admitted he never saw anything in writing to that effect, and reiterated that nothing in writing provided a basis for believing that he would be employed so long as he was productive. Plaintiff stated, however, that “I saw enough examples of that in the nine-plus years I was with them to support that judgment and that feeling very strongly.” Plaintiff evidently based his belief that he had continued employment on “Nine years of sitting through meetings” in which Lemons told managers that, if they did not meet performance goals, they would be put through “the grinder.” Plaintiff explained that “the grinder” was Lemons’s term. “Certain managers hadn’t made their production standard or their bills per man hour or some of the five or six standards that [Lemons] had set, and if they didn’t make it, then they were put into a grinder, which was a progressive disciplinary program that [Lemons] implemented. You had X number of days from the day you were put into this grinder to correct that situation or further disciplinary action would result.
 

 “Q. Was that a company policy or a Don Lemons policy?
 

 “A. Don Lemons policy.”
 

 Plaintiff acknowledged that the administrative manual as of 1985 contained the statement that “No provision of this chapter shall be construed as altering in any way the right of Consolidated Freightways to terminate the employment relationship at any time for any reason with or without cause,” but he claimed that CF had told him differently—“In many meetings they would say, ‘If you’re going to terminate somebody, you got to build a file, especially if he’s a certain age. What is in his file?’ [f] There were times when an [assistant terminal manager] would come to me and say, ‘We’ve got to get rid of this guy, this foreman’ or whatever, [ft] And I would say, ‘What kind of a file do you have on him, because Lemons is going to ask for a file.’ Because I’d go to Lemons. ‘What do you got [mc] on the guy?’ The same thing happened with DeLara.
 

 “Q. This building of a file, was it your belief that the building of a file was simply to provide evidence of somebody’s problems in the event the company later had a challenge to its termination, or did you believe that the company absolutely could not legally terminate somebody without this building of a file as you say?
 

 “A. Yes. In that type of progressive discipline, ... it was clear to me that you had to build a file
 
 unless somebody stole something, proven theft.
 

 
 *365
 
 “.
 

 “Q. Proven to whom?
 

 “A.
 
 To
 
 management.” (Italics added.)
 

 Plaintiff went on to explain that, “if I caught one of my supervisors at the time walking out the gate with a VCR . . . and I caught him, and somebody told me about it, because I wouldn’t probably see him, ‘Hey. This guy took a VCR out of trailer such and such, slipped on off the gate and is getting in his car with it,’ and I went out there, I could probably terminate him.
 

 “Q. But that would be your opinion that the person stole it or was attempting to steal it, would it not?
 

 “A. Well, but if I had witnesses who said they saw him stealing it, okay, then—
 

 “Q. But what about the situation where the person says, ‘This is a mistake.’ It would still be your opinion that the person was trying to steal, would it not?
 

 “A. It would be my opinion, sure. Probably more than one person’s opinion it would require.
 

 “Q. Well, you have given an example of where if you were the terminal manager and an incident occurred, you would in your mind believe that that was proper to terminate that person; right, that example that you gave?
 

 “A. Taking a $400 VCR out of a trailer and walking off the terminal and putting it in his car? Yeah, I would think the guy’s stealing it.
 

 “Q. Okay. And that’s the basis upon which somebody working below you might be terminated, right?
 

 “A. It’s not the basis. It’s one. The primary basis is, was time and again directed, ‘What do you have on the guy?’ Those were the words. ‘What’s his file look like? Bring me his file. Let’s see what kind of progressive discipline do we have.’ ”
 

 Plaintiff then described one incident in which he did actually terminate an employee for theft. Plaintiff and some CF security people observed the
 
 *366
 
 employee put VCR’s into the trunk of his car. Plaintiff believed that termination was proper. “But I think it’s improper to terminate a person because you don’t like the way he parts his hair, and I never understood anything other than that.
 

 “Q. Now, looking at Exhibit B [the at-will policy language] . . . [y]ou said that, so far as you know, that looks to be the policy of the company as of March of ’85. Now—
 

 “A. One that I was unaware of.
 

 “Q. Well, you do agree that the policies that are in the administrative manual, whether you have read them or not, are the policies of the company. You do agree with that, don’t you?
 

 “A.
 
 Yes. . .
 
 .” (Italics added.)
 

 C.
 
 Analysis
 

 Plaintiff argues on appeal simply that the existence of an implied in fact contract to terminate only for good cause is an issue of fact which cannot be resolved on a motion for summary judgment. He is mistaken.
 

 It is true that the existence of an implied in fact contract normally is to be determined by the trier of fact
 
 (Foley
 
 v.
 
 Interactive Data Corp.
 
 (1988) 47 Cal.3d 654, 681-682 [254 Cal.Rptr. 211, 765 P.2d 373]). If the facts are undisputed, however, and admit of only one conclusion, then summary judgment may be entered on issues that otherwise would have been submitted to the jury. That is the function of summary judgment proceedings. (See, e.g.,
 
 Slivinsky
 
 v.
 
 Watkins-Johnson Co.
 
 (1990) 221 Cal.App.3d 799 [270 Cal.Rptr. 585];
 
 Tollefson
 
 v.
 
 Roman Catholic Bishop
 
 (1990) 219 Cal.App.3d 843 [268 Cal.Rptr. 550];
 
 Miller
 
 v.
 
 Pepsi-Cola Bottling Co.
 
 (1989) 210 Cal.App.3d 1554 [259 Cal.Rptr. 56].)
 

 Plaintiff correctly identifies certain factual matters as significant to a determination whether an implied in fact contract exists: (1) the personnel policies and practices of the employer, (2) the employee’s longevity of service, (3) actions or communications by the employer reflecting assurances of continued employment, and (4) practices in the industry. This does not aid plaintiff, however, because he has failed to raise triable issues of fact respecting several of these factors.
 

 1.
 
 Personnel Policies and Practices.
 

 Under Labor Code section 2922, employment for an unspecified term is terminable at will. The presumption of at-will employment may
 
 *367
 
 be overcome by evidence of an implied agreement of continued employment, pending the occurrence of an event such as the employer’s dissatisfaction with the employee’s services or the existence of some cause for termination.
 
 (Luck
 
 v.
 
 Southern Pacific Transportation Co.
 
 (1990) 218 Cal.App.3d 1 [267 Cal.Rptr. 618].) CF presented competent evidence, in its personnel manual and through its knowledgeable officials, that the employment was terminable at will. Plaintiffs evidence failed to establish any agreement to the contrary.
 

 Although plaintiff “disputed” that CF had an at-will employment policy, he acknowledged that CF’s administrative manual had so expressly provided since 1985. Although he claimed he had not read the policy, plaintiff did not dispute that the at-will policy was in fact the company’s policy and that he was responsible to know the company’s policies. Indeed, he admitted he had attended CF management training courses in which the at-will policy was discussed and managers were told how to implement the policy in hiring, promotion and firing.
 

 Plaintiff described a “progressive discipline” system implemented by his superior, Lemons, for terminal managers, in which the managers would be “put into the grinder”; i.e., given deadlines for corrective action and otherwise pressured to meet production goals. Even if Lemons used techniques other than immediate termination to encourage compliance with production goals, that proves nothing regarding the existence or nonexistence of CF’s at-will employment policy. Otherwise, an employer would be forced purposely to terminate employees for any and every infraction—or none at all—in order to maintain the presumption of at-will employment. The law does not require such caprice to avoid creating an implied in fact contract.
 

 Plaintiff relies on his own testimony that his superiors instructed him (and he instructed his subordinates) to “build a file” to support an intended termination, “ ‘especially if he’s a certain age.’ ” This “policy” manifests no more than a business practice of taking care not to violate the law. “[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.”
 
 (Gantt
 
 v.
 
 Sentry Insurance
 
 (1992) 1 Cal.4th 1083, 1094 [4 Cal.Rptr.2d 874, 824 P.2d 680].) If CF required its managers to document terminations of nonunion employees over a certain age—i.e., to avoid
 
 unlawful
 
 terminations (e.g., for improper age discrimination)—such a practice does not establish a policy of termination only for
 
 good cause.
 
 Likewise, a practice that a manager must obtain approval from a more senior manager before acting on a decision to terminate an employee may avoid hasty action, but does not establish a policy or requirement of good cause for termination.
 

 
 *368
 
 Plaintiff conceded as undisputed that he received training as a manager in CF’s at-will employment policy and the impact of the policy on hiring, disciplining and terminating nonunion employees. He admitted the administrative manual was the operative document, that the administrative manual had included the express at-will language since early 1985, and that he was responsible for knowing and implementing CF’s policies in its administrative manual. Plaintiff never saw any written CF policies requiring good cause for termination. He also believed that, if a manager were satisfied that an employee had committed or attempted to commit theft, immediate termination was appropriate. Plaintiffs showing did nothing to rebut the presumption of at-will employment under Labor Code section 2922, or the actual existence of CF’s at-will employment policy.
 

 2.
 
 Longevity of Service.
 

 Longevity of service is one of the factors to be considered in determining whether an implied contract exists. Plaintiff did work for CF for nine years. He received regular promotions and salary increases. “Promotions and salary increases are natural occurrences of an employee who remains with an employer for a substantial length of time. These factors should not change the status of an ‘at-will’ employee to one discharge-able only for ‘just cause.’ ”
 
 (Miller
 
 v.
 
 Pepsi-Cola Bottling Co., supra,
 
 210 Cal.App.3d 1554, 1559.)
 

 3.
 
 Assurances of Continued Employment.
 

 Conspicuously absent from plaintiff’s pleadings or evidence is any hint that he was ever told at any time that he had permanent employment, or that he would be retained as long as he was doing a good job. In fact, he testified that he became aware, while still employed at CF, that CF had a reputation in the industry as an employer that fired good employees for no cause.
 

 4.
 
 Practices in the Industry.
 

 Plaintiff produced no evidence of any practice in the truck shipping industry of “just cause only” termination. The only evidence was to the contrary. Plaintiff testified at his deposition, and admitted as an undisputed fact that his employment contract with his current employer is expressly at will. Plaintiff “disputed” CF’s proposed undisputed fact that plaintiff had had no contract of employment with two previous trucking industry employers, but plaintiff’s only objection was that, if he was employed, he had an employment contract. To the extent that merely being employed with the other two companies created employment contract with them, however, the
 
 *369
 
 contracts were indefinite; i.e., presumptively at will. Nothing in plaintiff’s proffered evidence indicated otherwise.
 

 In short, although the factors of company policy and practice, the employee’s longevity of service, assurances of continued employment and practice in the industry are important factual matters to take into consideration in deciding whether an implied in fact contract to terminate only for good cause exists, CF was entitled to rely on the presumption of at-will employment and also supported its claims of the actual existence and practice of at-will employment. Plaintiffs opposition failed to controvert either the presumption or the actual practice of at-will employment. Plaintiff failed to demonstrate there was any triable issue of material fact to support his claim of an implied in fact contract. Summary judgment on the cause of action for breach of an implied in fact contract was proper.
 

 II.
 
 “Good Faith” Termination
 

 Plaintiff contends there were triable issues of fact as to the real reason for his termination, or whether CF in good faith believed he had stolen the jacket. We have already determined that summary judgment was proper on the first cause of action, because plaintiff failed to raise a triable issue of fact as to the existence of an implied in fact contract to terminate only for good cause. Because plaintiff could not overcome (i.e., could not raise a triable issue of material fact as to whether he could overcome) the presumption of at-will employment, CF was at liberty to discharge plaintiff for any reason or no reason (so long as it was not unlawful). Whether CF believed in “good faith” that it had cause to discharge plaintiff is thus irrelevant and we do not reach that issue.
 

 III.
 
 Discharge in Violation of Public Policy
 

 Plaintiff next urges that there were triable issues of material fact whether he was discharged in violation of public policy; that is, for refusing to take a polygraph examination.
 

 In
 
 Foley
 
 v.
 
 Interactive Data Corp., supra,
 
 47 Cal.3d 654, the California Supreme Court held that an employee may state a cause of action for wrongful termination in violation of fundamental public policy.
 
 (Id.
 
 at p. 699.) In
 
 Gantt
 
 v.
 
 Sentry Insurance, supra,
 
 1 Cal.4th 1083, the court clarified that the public policy violated must be “fundamental,” “substantial,” and “well-established” at the time of discharge, and it must be rooted in some constitutional or statutory provision.
 
 (Id.
 
 at pp. 1090, 1095.) Labor Code section 432.2, subdivision (a), prohibits an employer from requiring any
 
 *370
 
 employee to take a polygraph test as a condition of employment or continued employment. Section 432.2, subdivision (b), on which plaintiff appears chiefly to rely, provides: “No employer shall request any person to take such a test, or administer such a test,
 
 without first advising the person in writing at the time the test is to be administered of the rights guaranteed by this section.”
 
 (Italics added.) Plaintiff urges that CF offered no evidence that plaintiff was ever advised, in writing, of the guarantees of section 432.2.
 

 Plaintiff’s reliance on Labor Code section 432.2, subdivision (b), is mystifying, because plaintiff declined to take the polygraph test and none was ever administered. Labor Code section 432.2, subdivision (b), requires notice of the employee’s rights to be given in writing “at the time the test is to be administered.” That time never came in this case.
 

 To the extent plaintiff’s cause of action for wrongful termination in violation of public policy rests on Labor Code section 432.2, subdivision (a) —requiring an employee to take a polygraph examination as a condition to continued employment, plaintiff failed to raise a triable issue of fact on that matter.
 

 A.
 
 Agreed Undisputed Facts
 

 Plaintiff conceded that it was undisputed that Lemons, his supervisor, had conducted a preliminary investigation, and that Mark Epstein, a security officer at Mira Loma, also conducted an investigation into the allegations of theft against plaintiff. Plaintiff did not dispute that Epstein wrote a report concluding that plaintiff had stolen the jacket, although plaintiff did dispute the correctness of the conclusion. A third investigation was conducted by a special investigator from CF’s corporate security department. The special investigator also concluded plaintiff had stolen the jacket. Plaintiff did not dispute that the investigation took place or that the special investigator wrote a report concluding that plaintiff had stolen the jacket, although plaintiff again disputed the correctness of the conclusion.
 

 Plaintiff knew he could be immediately terminated if management found he had committed a theft. On November 27, 1989, therefore, plaintiff volunteered to take a polygraph examination or “do whatever it takes” to clear his name. No one other than plaintiff even remotely suggested on November 27 that plaintiff take a polygraph examination. When plaintiff met with the special investigator on November 28, plaintiff again volunteered that he would take a polygraph examination to prove his innocence. Plaintiff, not the special investigator, was the one who raised the idea of a polygraph examination. On November 29, plaintiff told Lemons, his boss, he still
 
 *371
 
 wanted to take the polygraph examination. The special investigator therefore arranged for a polygraph examination to be administered on December 1, 1989. Before going to the examination site, plaintiff then told Lemons that he had changed his mind about taking the polygraph examination, and asked for more time to think about whether he would take one. No polygraph examination was ever given. Plaintiff was terminated on December 1, 1989.
 

 B.
 
 Plaintiff’s Opposition
 

 It was undisputed that, on November 29, after plaintiff had twice volunteered to take a polygraph examination, Lemons told plaintiff that the results of the investigations were not favorable and that plaintiff would likely be terminated. Lemons also told plaintiff that, if he still wanted to take the polygraph examination, and if the results were favorable, Lemons “possibly would reconsider” his decision to terminate plaintiff. In opposition to the motion for summary judgment, plaintiff pointed to his deposition testimony that Lemons had also told plaintiff “ ‘You don’t take the poly, you’re gone.’ ”
 

 C.
 
 Analysis
 

 Although a statutorily based public policy forbids employers from
 
 requiring
 
 employees to take a polygraph examination as a condition to continued employment, nothing in Labor Code section 432.2 prevents an employee from volunteering to take a polygraph examination. (See 43 Ops.Cal.Atty.Gen. 25, 26 (1964).) Plaintiff did not dispute that he was the one who brought up the possibility of a polygraph examination. No one else remotely suggested it. Plaintiff ¿so did not contradict CF’s showing that Lemons had informed plaintiff of the unfavorable results of the investigations and of plaintiffs probable dismissal. Lemons told plaintiff that, if plaintiff went ahead and took the polygraph and passed it, Lemons might have a reason to reconsider his decision to terminate plaintiff, but otherwise he would have nothing to support plaintiff’s version that the taking of the jacket was a mistake. Even if this advice were couched in relatively crude terms (“ ‘You don’t take the poly, you’re gone’ ”), plaintiff has utterly failed to show that the employer unlawfully
 
 required
 
 a polygraph as a condition to continued employment. Summary judgment was proper on this cause of action.
 

 IV.
 
 Defamation
 

 Finally, plaintiff argues there were triable issues of fact on his cause of action for defamation. He asserts that an accusation of theft is slanderous
 
 *372
 
 per se, and that it was up to the jury to determine whether the charge of theft were true, or whether it was made in reckless disregard of the truth. He further argues that there were triable issues of fact whether CF made alleged defamatory statements to plaintiff under circumstances which forced him to disclose the contents of the defamatory statement to third parties (i.e., future employers who would want to know the circumstances of his termination).
 

 A.
 
 Agreed Undisputed Facts
 

 Plaintiff conceded the following facts were undisputed:
 

 Plaintiff himself published the theft incident and surrounding circumstances throughout the trucking industry and at CF both before and after his termination. Some of the people plaintiff talked to had heard about the incident secondhand or thirdhand; others did not remember how they heard about it. Most of the people plaintiff spoke to heard about the incident for the first time from plaintiff himself.
 

 Sometime during the week of November 27, 1989, plaintiff met with a bargaining unit employee who had seen plaintiff with the jacket on November 22. Plaintiff’s purpose was to proclaim his innocence. Plaintiff also invited a union steward to be present at this meeting. Plaintiff invited the union steward to attend even though he knew that, once bargaining unit (union) employees became aware of the incident, word would spread throughout the facility. At least one person to whom plaintiff spoke thereafter said that a union steward was spreading rumors about the incident.
 

 Although plaintiff claimed he was not hired by another trucking company after his discharge from CF because of alleged defamatory statements by CF and the named CF defendants, plaintiff admitted in his deposition that his claim was based on pure speculation. Plaintiff did not dispute that none of the named defendants repeated the reasons for plaintiff’s discharge to any outside employer. The employees who conducted CF’s investigation kept their reports confidential and did not discuss the investigation with anyone other than Lemons, Paulsen or the investigator’s own supervisors. Plaintiff further did not dispute that CF has a strictly enforced policy of telling prospective employers of former employees only the dates of work with CF, and that CF does not release the reason why an employee no longer works at CF. Plaintiff did not dispute that the only repetitions of the reasons for plaintiffs termination were made to plaintiff himself or to the managerial employees charged with the decision to terminate plaintiff.
 

 B.
 
 Plaintiff’s Opposition
 

 Plaintiff’s sole line of opposition to the motion for summary judgment was that he had been forced to republish the jacket incident himself in order to explain to prospective employers why he left CF.
 

 
 *373
 
 C.
 
 Analysis
 

 Plaintiff relies on
 
 McKinney
 
 v.
 
 County of Santa Clara
 
 (1980) 110 Cal.App.3d 787 [168 Cal.Rptr. 89] for the proposition that self-publication of the alleged defamatory statement may be imputed to the originator of the statement if “the person defamed [is] operating under a
 
 strong compulsion
 
 to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed.”
 
 (Id.
 
 at p. 797-798, italics added.) That is, republication might be foreseeably required if “a job seeker must tell a prospective employer what is in his personnel file
 
 in order to explain away a negative job
 
 reference.”
 
 (Live Oak Publishing Co.
 
 v.
 
 Cohagan
 
 (1991) 234 Cal.App.3d 1277,1287 [286 Cal.Rptr. 198], explaining
 
 McKinney,
 
 italics added.)
 

 Plaintiff failed to establish, however, any fact or triable issue of fact that there was any “strong compulsion” to republish the alleged defamatory matter to prospective employers, because he failed to show there was ever any “negative job reference” attributable to CF that plaintiff had to explain. Plaintiff conceded that CF had a strictly enforced policy against giving out any information to prospective employers about former employees except their dates of employment. Plaintiff conceded there was no indication that any CF representative ever discussed the incident outside CF. Plaintiff admitted that Lemons never discussed his termination except with Lemons’s own boss, Paulsen. Plaintiff never disputed that those conducting the investigations never discussed the incident beyond the scope of their investigations.
 

 Plaintiff admitted, however, that he himself talked about the incident inside and outside CF, trying to garner support. Plaintiff voluntarily told union employees, including the steward, even though he knew that union employees would likely spread the story. Nothing showed that plaintiff had anything he was compelled to explain to prospective employers, and in fact plaintiff never alleged that any prospective employers ever asked him about or asked him to explain the incident. Thus, plaintiff has failed to demonstrate any facts, raising a triable issue of material fact, that he was compelled to republish any defamatory matter. Summary judgment was properly granted as to the defamation cause of action.
 

 Disposition
 

 Summary judgment was properly granted to all plaintiff’s causes of action. Because plaintiff Kathi Davis’s cause of action for loss of consortium
 
 *374
 
 was dependent upon the validity of plaintiffs claims, summary judgment was also properly granted as to her complaint. Accordingly, the judgment of dismissal is affirmed. Respondents shall recover costs on appeal.
 

 McKinster, J., and McDaniel, J.,
 
 *
 
 concurred.
 

 [1]
 

 Plaintiff Kathi Davis sued for loss of consortium based on the alleged wrongful termination of Chuck Davis. Her claims are derivative of his. Because we find the trial court properly granted summary judgment on Chuck Davis’s claims, Kathi Davis’s loss of consortium claim also fails. For this reason we do not discuss Kathi Davis’s claims further, and refer to Chuck Davis alone as the plaintiff.
 

 [2]
 

 The description of plaintiffs opposition, consisting solely of references to plaintiffs deposition testimony, also describes portions of plaintiffs deposition which were not included in plaintiffs opposition papers, but which are needed to place the deposition excerpts in proper context.
 

 *
 

 Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.