Filed 10/26/20; Opinion on rehearing

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MICHAEL A. TILKEY, | D074459 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2016-00015545-CU-OE-CTL) |
| ALLSTATE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge. Affirmed in part; reversed in part.

Brown Law Group, Janice P. Brown, Arlene R. Yang; Akin Gump Strauss Hauer & Feld, Rex S. Heinke, Jessica M. Weisel; Cozen & O'Connor, Anneliese Wermuth, and Jenny R. Goltz, for Defendant and Appellant.

Edleson & Rezzo, Louis "Chip" Edleson, Joann F. Rezzo; Williams Iagmin and Jon R. Williams, for Plaintiff and Respondent.

INTRODUCTION

While Michael Tilkey and his girlfriend Jacqueline Mann were visiting at her home in Arizona, the two got into an argument. Tilkey decided to leave the apartment. When he stepped out onto the enclosed patio to collect his cooler, Mann locked the door behind him. Tilkey banged on the door to

regain entry, and Mann called police. Police arrested Tilkey and charged him under Arizona law with criminal damage deface, possession or use of drug paraphernalia, and disorderly conduct, disruptive behavior. Domestic violence charges were attached to the criminal damage and disorderly conduct charges.

Tilkey pled guilty to the disorderly conduct charge only, and the other two charges were dropped. After Tilkey completed a domestic nonviolence diversion program, the disorderly conduct charge was dismissed. Before the disorderly conduct charge was dismissed, Tilkey's company of 30 years, Allstate Insurance Company (Allstate), terminated his employment based on his arrest for a domestic violence offense and his participation in the diversion program. Allstate informed Tilkey it was discharging him for threatening behavior and/or acts of physical harm or violence to another person. Following the termination, Allstate reported its reason for the termination on a Form U5, filed with Financial Industry Regulatory Authority (FINRA) and accessible to any firm that hired licensed broker-dealers like Tilkey. Tilkey sued Allstate for wrongful termination in violation of Labor Code[1] section 432.7 and compelled, self-published defamation.

At trial, Allstate presented evidence that it would have terminated his employment based on after-acquired evidence that Tilkey had circulated obscene and inappropriate e-mails using company resources.

---

[1] Further statutory references are to the Labor Code unless otherwise specified.

The jury returned a verdict in Tilkey's favor on all causes of action and awarded him $2,663,137 in compensatory damages and $15,978,822 in punitive damages. It advised the court that it did not find Allstate's after-acquired evidence defense credible, and the court agreed.

Allstate appeals the verdicts, contending (1) it did not violate section 432.7 and so there was no wrongful termination; (2) compelled self-published defamation per se is not a viable tort theory; (3) it did not defame Tilkey because there is not substantial evidence its statement was not substantially true; (4) punitive damages are unavailable in compelled self-publication defamation causes of action; (5) the defamatory statement was not made with malice; and (6) the punitive damages awarded here were unconstitutionally excessive.

We agree that Allstate did not violate section 432.7 when it terminated Tilkey's employment based on his plea and his participation in an Arizona domestic nonviolence program and will reverse that judgment. However, we conclude compelled self-published defamation is a viable theory, and substantial evidence supports the verdict that the statement was not substantially true, so we will affirm that portion of the judgment. Additionally, while we conclude punitive damages are available in this instance, the punitive damages awarded here are not proportionate to the compensatory damages for defamation, and we will remand the matter with directions regarding the recalculation of punitive damages.

FACTUAL AND PROCEDURAL BACKGROUND

On August 16, 2014, Tilkey was staying with his girlfriend, Mann, and her young grandson in Arizona. After going out for the evening and drinking, the two began to argue, and Tilkey decided to leave the home. When Tilkey

3

stepped outside onto the enclosed patio, Mann closed and locked the patio door, which was a traditional door with glass panes. Tilkey banged on the patio door, demanding to be let back in so he could gather his belongings, which were in the bedroom where Mann's grandson was sleeping. Mann called police.

When police arrived, Mann told them she did not want Tilkey in the apartment because she was afraid he would wake up her grandson. Police noted the interior trim on the framing above the patio door was broken.

Officers searched Tilkey's travel bag, which contained marijuana and a plastic container used to smoke marijuana. Police arrested Tilkey and filed three charges against him: criminal damage deface (Arizona Revised Statute [A.R.S.] § 13-1602A1), possession or use of drug paraphernalia (A.R.S. § 13-3415A), and disorderly conduct - disruptive behavior (A.R.S. § 13-2904A1). A domestic violence label was attached to the criminal damage and disorderly conduct charges.

On August 31, 2014, Mann sent an e-mail to Tilkey at work mentioning the charges that had been filed against him. A field compliance employee later discovered this e-mail while conducting a routine compliance review and forwarded it to Human Resources (HR). HR professional Tera Alferos conducted the initial investigation; she interviewed Tilkey December 4, 2014. She noted Tilkey had been asked to accept a plea deal to have two of the three charges dropped, then the last one dismissed. She never spoke with Mann or interviewed the arresting officers. She also did not investigate Mann's background or review her social media accounts.

Mann sent an e-mail to Allstate March 3, 2015, which revealed the arrests and made several other allegations. That same day, the e-mail was shared with Harriet Harty, Executive Vice President of HR; Christina

4

Metzger, Vice President of HR; and Tyrone Burno, Director of HR. Alferos added the e-mail to the case file. A couple weeks later, Alferos sent Burno a summary of her investigation, which stated that the police report had been reviewed and noted Tilkey had been charged with but not convicted of a crime. The summary also explained there was no FINRA reporting obligation because there were no felony charges, and it concluded there had been no violation of company policy.

On March 31, 2015, Alferos provided Burno with a revised summary of investigation that added that Tilkey had entered a diversion program for the disorderly conduct (domestic violence) charge, resulting in a deferred prosecution. Burno then changed the conclusion to state Tilkey's behavior may have been at a level that caused the company to lose confidence in him. Burno supplied this version of the summary of investigation to Metzger, Harty, and Greg Burns, the senior vice president of HR, the same day.

At Burno's request, Alferos next added references to the domestic violence charge because it suggested Tilkey had engaged in behavior that could be construed as acts of physical harm or violence toward another person, in violation of company policy.

On April 16, 2015, Metzger e-mailed Harty stating she and Burns could support a decision to terminate Tilkey's employment or not. In a May 4, 2015 e-mail referencing the decision to terminate Tilkey's employment, Metzger wrote that they were amending the reason for terminating Tilkey to be "violence against another person whether employed by Allstate or not." Alferos submitted a formal termination request two days later stating that based on Tilkey's voluntary entrance into a diversion program, he had engaged in acts of physical harm or violence to another person. It identified the policy violation as "[t]hreats or acts of physical harm or violence to the

5

property or assets of the Company, or to any person, regardless of whether he/she is employed by Allstate." The summary of investigation attached to the termination request stated, "the retention of the domestic violence charges suggests that Tilkey engaged in behavior that was construed as acts of physical harm or violence towards another person."

Following written approval from Tilkey's supervisors, the company terminated Tilkey's employment on May 27, 2015. When the company terminated his employment, it informed Tilkey, "Your employment is being terminated as a result of engaging in behaviors that are in violation of Company Policy. Specifically, engaging in threatening behavior and/or acts of physical harm or violence to any person, regardless of whether he/she is employed by Allstate."

The company then filed a Form U5 with FINRA[2] reporting its reason for terminating him as follows: "Termination of employment by parent property and casualty insurance company after allegations of engaging in behaviors that are in violation of company policy, specifically, engaging in threatening behavior and/or acts of physical harm or violence to any person, regardless of whether he/she is employed by Allstate. Not securities related."

On July 1, 2015, the State of Arizona filed a motion to dismiss the case against Tilkey with prejudice, and the court approved it the same day.

Tilkey sued Allstate asserting three causes of action: (1) violation of section 432.7; (2) wrongful termination based on noncompliance with section 432.7; and (3) compelled self-published defamation to prospective employers.

---

[2] The Form U5 is a document to let FINRA know if there is a change in the status regarding the licensing of a licensed broker dealer.

As part of its defense at trial, Allstate presented evidence that Tilkey had used company equipment, including the company-issued laptop computer and the company's Intranet and Internet system, to forward e-mails containing graphic nudity and racist jokes, among other items. It argued that had it known of these e-mails at the time, it would have discharged Tilkey. Tilkey presented evidence that the circulation of the e-mails was part of the culture of the workplace.

Following trial, the jury returned a verdict for Tilkey and awarded $2,663,137 in compensatory damages, with $960,222 for wrongful termination and $1,702,915 for defamation, and $15,978,822 in punitive damages. The jury concluded that Tilkey engaged in misconduct by sending the inappropriate e-mails. However, it also advised the court that the misconduct was not sufficiently severe that Allstate would have discharged him as a matter of settled company policy because of that misconduct alone had Allstate known of it. The court agreed.

Allstate moved for a judgment notwithstanding the verdict (JNOV) and for a new trial, motions which the trial court denied. Allstate timely appealed.

On April 21, 2020, this court filed its original opinion, affirming the judgment in part and reversing it in part.

Tilkey filed a timely petition for rehearing, arguing we incorrectly concluded his guilty plea was entered and asking us to determine the maximum permissible amount of punitive damages. Allstate also filed a timely petition for rehearing, arguing our opinion misstated the role of FINRA and the Form U5 reporting requirements, contending the role of the Form U5 in compelling self-published defamatory statements was overstated,

noting some facts from the record were omitted from our opinion, and asking us to reverse our conclusion regarding the availability of punitive damages.

We granted the requests for rehearing on May 27, 2020 and received supplemental briefing. We have considered all the materials the parties submitted and we again affirm the judgment in part and reverse the judgment in part.

## DISCUSSION

## I.

## WRONGFUL TERMINATION

Allstate argues it did not violate section 432.7 when it used as a factor in its termination decision Tilkey's arrest and subsequent conditional plea and entry into a diversion program. Tilkey counters that the company's reliance on his arrest records violated section 432.7; thus, he was wrongfully terminated. The parties' disagreement hinges on the interpretation of section 432.7, subdivision (a)(1), which prohibits employers from utilizing as a factor in employment decisions any record of arrest or detention that did not result in conviction or any record regarding referral to or participation in any pretrial or posttrial diversion program.[3]

## A.

### *Standard of Review*

Statutory interpretation is a legal issue, which we review de novo. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1247.) In interpreting a statute, we attempt "to ascertain and effectuate the law's

---

[3] The statute also prohibits an employer from seeking or using as a factor in an employment decision any record that concerns a conviction that has been judicially dismissed. (§ 432.7, subd. (a)(1).) The parties did not raise this as a basis for the wrongful termination claim.

intended purpose." (*Id.* at p. 1246.) Our " 'fundamental task' " is " 'to determine the Legislature's intent so as to effectuate the law's purpose.' " (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366; *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198 (*Fluor*).) " ' "We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent." [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, "the statutory language may reasonably be given more than one interpretation, ' " 'courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.' " ' " [Citation.]' [Citation.]" (*Fluor*, at p. 1198.)

B.

*Tilkey's Conditional Plea Agreement*

Section 432.7 prohibits an employer from considering as a factor in employment decisions including termination of "any record of arrest . . . that did not result in a conviction." (§ 432.7, subd. (a)(1).) Allstate argues a conditional plea agreement qualifies as a conviction. Tilkey contends he never entered a guilty plea; thus, there was no conviction. As we will explain, we conclude the term "conviction" as defined in section 432.7 does not require entry of judgment.

" '[T]he term "conviction" has no fixed definition and has been interpreted by the courts of this state to have various meanings, depending upon the context in which the word is used.' [Citation.]" (*People v. Kirk* (2006) 141 Cal.App.4th 715, 720). However, here, the

9

statute defines a "conviction" to include "a plea, verdict, or finding of guilt regardless of whether sentence is imposed by the court." (§ 432.7, subd. (a)(3)(A).) The plain language here makes clear that a judgment is not required because the conviction can exist without respect to sentencing. (See *ibid.*)

The statute's legislative history supports this interpretation. In 2013, the Legislature amended section 432.7 to include, among those items prohibited from a prospective employer's consideration, prior convictions that were dismissed by a court pursuant to Penal Code section 1203.4 unless the conviction was related to job performance. (Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 530 (2013-2014 Reg. Sess.) Apr. 23, 2013, p. 7, ¶ 3.) The purpose of the amendment was "to close some loopholes and provide additional tools and changes to existing law to make effective existing state policy to remove employment barriers to those who have committed crimes that have been expunged by the courts." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 530 (2013-2014 Reg. Sess.) June 25, 2013, pp. 2-3.) This addition demonstrates that convictions and dismissed convictions represent two different categories of convictions. It also verifies that a conviction can exist even before judgment is entered, and it is different from one that is subsequently dismissed or expunged.

Allstate asks us to follow the example provided by *People v. Laino* (2004) 32 Cal.4th 878. While the cases are factually similar, there are distinctions between the provision of the "Three Strikes" law and section 432.7 that make the comparison imprecise. In *Laino,* the defendant pled guilty in Arizona to assault with a firearm against his wife and received probation that included a diversion program, which he successfully completed. (*Laino*, at p. 882.) The defendant was never

10

sentenced for the crime because he complied with the terms of the agreement; instead, the court dismissed the charges. (*Ibid.*) The defendant was later charged with two counts of theft in California, and he argued the conditional guilty plea he entered in Arizona was not a conviction for purposes of the Three Strikes law. (*Laino*, at p. 896.)

The Supreme Court disagreed because California's Three Strikes law imposes punishment "[n]otwithstanding any other law" if the defendant was previously convicted of a felony. (Pen. Code, §§ 667, subd. (c), 1170.12, subd. (a).) The Three Strikes law defines "conviction" to include convictions in other jurisdictions that would be punishable by imprisonment if committed in California, based on the date of the conviction and unaffected by the sentencing. (Pen. Code, §§ 667, subd. (d)(1) & (2), 1170.12, subd. (b)(1) & (2).) Thus, under the Three Strikes law, "it is settled that for purposes of a prior conviction statute, a conviction occurs at the time of entry of the guilty plea." (*People v. Castello* (1998) 65 Cal.App.4th 1242, 1253.)

Section 432.7 does not contain similar provisions. The Labor Code does not provide details for determining the impact of a conviction in another jurisdiction or state that a conviction occurs on the date of the conviction. However, it does define conviction to include a plea, regardless of whether the court ultimately imposes a sentence. (See § 432.7, subd. (a)(3)(A).) Thus, for purposes of the Labor Code, a conviction does not require an entry of judgment of guilt; it merely requires the entry of a plea.

Having determined what "conviction" means in the context of section 432.7, we turn now to the plea-related documents in the matter. In

11

his petition for rehearing, Tilkey revisits the analysis we offered below, arguing that the plea was a conditional plea never entered onto the record. We decline to alter our conclusion on the matter.

On January 15, 2015, Tilkey, his attorney, and the prosecutor signed a document entitled "Plea Agreement Diversion." The agreement stated it would "serve the ends of justice to suspend entry of judgment so that the defendant may participate in a diversion program." From this language, as well as a later-filed motion to dismiss the remaining charge, we conclude that there was no judgment of guilt in the Arizona court. However, as we have explained, a conviction under section 432.7 does not require an entry of judgment; it simply requires entry of a guilty plea.

Section 9 of the Plea Agreement Diversion document suggests that the guilty plea agreement was not entered because it says that it "will be entered on the record by the Court" if the defendant "fails to timely show proof of compliance" with the conditions stated in the agreement. The defendant's signature on the document certifies that he "agree[s] to enter my plea of guilty as indicated above on the terms and conditions set forth in this document." These conditions included a domestic nonviolence program under the supervision of an Arizona company, as well as payment of court costs, and assessments, and compliance with other limitations, like nonpossession of firearms and staying away from Mann. Thus, this document shows Tilkey agreed to enter a type of deferred prosecution, with the entry of guilty plea delayed until the prosecutor determined that Tilkey had completed the diversion program and remained in compliance with the other terms of the agreement.

However, also on January 15, 2015, the Arizona court held a guilty plea proceeding. Appearing in that proceeding, Tilkey "expresse[d] a desire to plead guilty to" a class 1 misdemeanor, disorderly conduct fighting (DV), A.R.S. § 13-2904A1. Tilkey, his attorney, and the court signed this document, in which Tilkey certified that he understood "the constitutional rights which [he] [gave] up by *entering this plea* and that [he] still desire[d] to plead guilty." (Italics added.) The court's signature on the document certifies that it "conclude[s] that the [d]efendant knowingly, voluntarily and intelligently *enters a plea* to the above charge(s), and [it] accept[s] their plea." (Italics added.) The first document indicated a willingness to enter a diversion program on the promise of a deferred prosecution; the second document shows entry of a guilty plea.

This understanding of what occurred is supported by the testimony of Tilkey's Arizona attorney, Carlos Estrada, who could not recall discussing with Tilkey whether the agreement would lead to a conviction, just that it would lead to a dismissal of the charges. Estrada testified that the purpose of the plea agreement diversion document and the guilty plea proceeding document were for the court to suspend the entry of *judgment* of guilt so that successful completion of the diversion program would result in dismissal of the remaining charge. Tilkey's testimony likewise focused on the ultimate outcome of the case; when asked if he believed the plea of guilt he entered had been entered on the record, Tilkey replied that he believed *completion* of the diversion program would mean there would not be "any record of anything anywhere."

Because Tilkey appeared before the Arizona court and entered a guilty plea, which the court accepted, Tilkey's guilty plea was a conviction

13

under section 432.7.  This information was used by Allstate to terminate Tilkey's employment in May 2015, before the charges against Tilkey were dismissed on July 1, 2015.  Thus, Allstate did not violate section 432.7 by using Tilkey's Arizona arrest as a factor in its decision to terminate his employment.

## C.

*Tilkey's Referral to and Participation in Nondomestic Violence Diversion Program*

Section 432.7 also prohibits an employer from considering as a factor in an employment decision records of referral to or participation in a diversion program.  (§ 432.7, subd. (a)(1).)  It defines a pretrial or posttrial diversion program as "any program under Chapter 2.5 (commencing with Section 1000) or Chapter 2.7 (commencing with Section 1001) of Title 6 of Part 2 of the Penal Code, Section 13201 or 13352.5 of the Vehicle Code, Sections 626, 626.5, 654, or 725 of, or Article 20.5 (commencing with Section 790) of Chapter 2 of Part 1 of Division 2 of, the Welfare and Institutions Code, *or any other program expressly authorized and described by statute as a diversion program.*"  (§ 432.7, subd. (j), italics added.)

Allstate argues that because California views domestic nonviolence diversion programs as contrary to public policy, such a program is unauthorized, and thus the company's consideration of Tilkey's participation in one did not violate section 432.7.  Tilkey contends that a domestic nonviolence diversion program is one that is expressly authorized and described by statute in Arizona, and thus Allstate was prohibited from considering Tilkey's participation.

14

Because there is ambiguity here, we consider the Legislature's intent. (*Fluor, supra*, 61 Cal.4th at p. 1198.) In 1976, the California Attorney General issued an opinion questioning the authority of local prosecutors and courts to offer diversion programs for behavior identified by the Legislature as unlawful; it suggested counties could not legally institute diversion programs. (Health and Welfare Agency, Dept. of Health, Enrolled Bill Report on Assem. Bill No. 533 (1977-1978 Reg. Sess.) Aug. 31, 1977, p. 1; Assemblyman Majority Leader Howard L. Berman, letter to Governor Edmund G. Brown, Jr. re Assem. Bill No. 533 (1977-1978 Reg. Sess.) Aug. 31, 1977, p. 1 [Berman Letter].) At the time, the state had collected little data regarding the effectiveness of diversion programs. (Berman Letter, at pp. 2-3.) Assembly Bill No. 533 authorized local communities to establish diversion programs and required counties employing the programs to supply annual reports to the Legislature. (Health and Welfare Agency, Dept. of Health, Enrolled Bill Report on Assem. Bill No. 533, *supra*, p. 2.)

In 1979, the Legislature expressly authorized diversion for misdemeanor domestic violence charges using a system similar to the domestic nonviolence diversion program options available to Tilkey in Arizona. (See Stats. 1979, ch. 913, § 1; Pen. Code, § 1000.6 et seq. [repealed].) The California statutes allowed courts to permit pretrial diversion without an admission of guilt and to dismiss criminal charges following successful completion of the program. (*Id.* at §§ 1000.6, subds. (a), (c); 1000.9 [repealed].)

During the 1995-1996 legislative session, the Legislature revisited domestic violence diversion programs. Domestic violence diversion

15

programs were not meeting their intended goal, with only a 50 percent success rate reported in Los Angeles, and difficulty prosecuting cases when perpetrators failed to complete their diversion programs. (Sen. Rules Com., Office of Sen. Floor Analyses, 3d Reading analysis of Assem. Bill No. 168 (1995-1996 Reg. Sess.) as amended July 14, 1995, pp. 3-4; Sen. Rules Com., Office of Sen. Floor Analyses, 3d Reading analysis of Assem. Bill No. 169 (1995-1996 Reg. Sess.) as amended July 15, 1995, pp. 3-4.) The Assembly and Senate introduced competing bills.

Assembly Bill No. 168 would have allowed domestic violence perpetrators to plead guilty and defer entry of judgment, contingent upon successful completion of a diversion program. (Sen. Rules Com., Office of Sen. Floor Analyses, 3d Reading analysis of Sen. Bill No. 168 (1995-1996 Reg. Sess.) as amended July 14, 1995, p. 2.) Senate Bill No. 169 would eliminate diversion as an option in all domestic violence cases. (Sen. Rules Com., Office of Sen. Floor Analyses, 3d Reading analysis of Assem. Bill No. 169 (1995-1996 Reg. Sess.) as amended July 15, 1995, p. 3, ¶ 1.)

After the Legislature passed both bills, the governor vetoed Assembly Bill No. 168, commenting, "we can no longer continue to treat domestic violence cases as if they are not more significant than traffic violations." (Governor's veto message to Assem. on Assem. Bill No. 168 (Oct. 4, 1995) (1995-1996 Reg. Sess.) p. 1.) The governor compared the two bills, explaining that Assembly Bill No. 168 would deem the arrest, which formed the basis for the diversion to have never occurred, and explaining the "problem is a lack of accountability" because perpetrators could "opt to attend a counseling program without ever acknowledging that they have committed a crime and are prepared to accept the consequences." (*Ibid.*)

16

He wrote that offering a deferred entry of judgment would merely be a cosmetic change and stated, "We must change the culture which makes domestic violence acceptable and dispel the myth that the battering of a domestic partner is a family matter, and something less than a crime." (*Id.* at pp. 1-2.)

The state abolished domestic violence diversion programs about a decade before Tilkey engaged in the domestic nonviolence program in Arizona. Were he to have been charged with the same crime in California, a diversion program would not have been an option. It would be contrary to California's public policy against misdemeanor domestic violence diversion programs to prohibit consideration of Tilkey's participation in one. The location of the crime in Arizona does not have any effect on California's public policy opposing diversion for domestic violence offenses.

Accordingly, we conclude section 432.7's reference to diversion programs excludes out-of-state domestic violence programs, and Allstate's consideration of Tilkey's participation in one did not violate the law.

We are unpersuaded by Tilkey's argument that the lack of reference to California authorities in section 432.7 means the Legislature did not intend to limit consideration of diversion programs only to those offered in California. The statutes cited by Tilkey as evidence the Legislature is capable of limiting the scope of its laws are different in kind than one authorizing diversion in lieu of criminal conviction because they relate to physical location for purposes of jurisdiction (see, e.g., sections 220.2 and 226 referencing the location of employment records), or the geographical location of people protected by employment laws (see, e.g., §§ 250 [seasonal labor to include employees hired in California who

17

perform work out of state]; 1060, subd. (c) [applying only to employees whose "primary place of employment" is within California]; 1071 [addressing public transit employment within California].)

We also disagree with Tilkey's claim that concluding a domestic violence diversion program offered in Arizona is not protected under section 432.7 means section 432.7 applies only to California arrests, detentions, and diversion programs. Our conclusion is more narrow: domestic violence diversion programs offered outside California are not protected under section 432.7 because California policy excludes such a benefit.

Finally, citing *People v. Bedrossian* (2018) 20 Cal.App.5th 1070, Tilkey maintains that California provides statutory protections to domestic violence arrests and convictions and, therefore, we should honor Tilkey's participation in a domestic nonviolence diversion program. In *Bedrossian*, the First Appellate District Court of Appeal recognized that records of an arrest for domestic violence can be expunged under Penal Code section 851.8 when no accusatory pleading is filed. This case is not helpful because, unlike Tilkey, the defendant in *Bedrossian* did not plead guilty or admit any factual basis for the charges against him. (See *id.* at p. 1073.) There, the court reasoned that the risk Bedrossian would be harmed by a delay in destruction of arrest records was mitigated by statutory protections like section 432.7 (*Bedrossian*, at p. 1075), but

Bedrossian was not at risk because his arrest did not result in a conviction or a referral to a diversion program.[4] (*Bedrossian*, at p. 1073.)

Having concluded that Allstate did not violate section 432.7 by utilizing Tilkey's arrest or participation in a domestic nonviolence diversion program as a factor in its employment termination decision, we will reverse the wrongful termination verdict.

## II.

## DEFAMATION

Allstate next challenges the defamation verdict, contending that self-compelled defamation should not provide a basis for a defamation per se cause of action. It further contends there was no evidence here that Tilkey's self-publication was compelled by its publication of the reason for his employment termination on the Form U5 because that publication

---

[4] Allstate does not argue, and we do not hold, that it would be proper for an employer to consider, after charges are dismissed, an arrest that results in conviction and punishment, followed by dismissal under Penal Code section 1203.4, which is the factual situation presented in the other cases cited by Tilkey. (See *People v. Seymour* (2015) 239 Cal.App.4th 1418, 1421-1422 [defendant permitted to have felony domestic violence charge dismissed due to discharge from probation prior to termination of probation period]; see also *Shirey v. Los Angeles County Civil Service Comm.* (2013) 216 Cal.App.4th 1, 4-5 [battery conviction set aside following probation and not guilty plea entered].) Penal Code section 1203.4 permits a court, in the interests of justice, after a defendant has fulfilled conditions of probation, or after a defendant has been discharged prior to the termination of probation, to withdraw a guilty plea or to set aside a guilty verdict, and to dismiss the accusations or information. The defendant is "thereafter. . . released from all penalties and disabilities resulting from the offense of which he or she has been convicted . . . ." (Pen. Code, § 1203.4, subd. (a)(1).) In contrast, when Tilkey was discharged from employment, the domestic violence charge against him had not been dismissed. Moreover, nothing prohibited Allstate's consideration of referral to a diversion program.

19

contained a privileged statement.  Finally, Allstate maintains that its statement was substantially true, justifying reversal of the verdict.

We review questions of law, and therefore the viability of self-compelled defamation per se theory, de novo.  (*Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 779-780.)  We look for substantial evidence regarding whether Tilkey was compelled to self-publish the defamatory statement, and we look for substantial evidence regarding whether the statement was substantially true.  (See *Sweatman v. Department of Veteran Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*) [denial of JNOV reviewed under substantial evidence standard].)  In so doing, we do not " 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.' "  (*Do v. Regents of the University of California* (2013) 216 Cal.App.4th 1474, 1492 (*Do*).)  We consider disputed facts in a light most favorable to the jury's verdict.  (*Ibid.*)

For a valid defamation claim, the general rule is that "the publication must be done by the defendant."  (*Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1284 (*Live Oak Publishing*).)  There is an exception "when it [is] foreseeable that the defendant's act would result in [a plaintiff's] publication to a third person."  (*Ibid.*)  For the exception to apply, the defamed party must operate under a strong compulsion to republish the defamatory statement, and the circumstances creating the compulsion must be known to the originator of the statement at the time he or she makes it to the defamed individual.  (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 497 (*Beroiz*); *Davis v. Consolidated*

20

*Freightways* (1994) 29 Cal.App.4th 354, 373 (*Davis*); *Live Oak Publishing*, at p. 1285; *McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 787, 796 (*McKinney*).)

A.

*Compelled Self-Published Defamation Per Se*

Allstate asks us to reject combining the doctrines of defamation per se and self-defamation, arguing the two theories are at odds because compelled self-publication must occur for the purpose of countering an injury (loss of employment opportunity), while defamation per se does not require proof of actual damages. We do not find these theories in conflict. In an action for defamation per se, the meaning is so clear from the face of the statement that the damages can be presumed. (*Contento v. Mitchell* (1972) 28 Cal.App.3d 356, 358 (*Contento*).) However, that presumption does not mean an employee does not anticipate injury; nor does it mean there is no injury.

Moreover, while compelled self-published defamation per se technically eliminates the need for publication by the defendant to a third party, a plaintiff cannot manufacture the defamation claim by simply publishing statements to a third party because the plaintiff must disclose contents of the employer's statement to a third party *after* reading or being informed of the contents. (*Live Oak Publishing, supra*, 234 Cal.App.3d at p. 1284.) The originator of the statement is liable for the foreseeable repetition because of the causal link between the originator and the presumed damage to the plaintiff's reputation (see *id.* at p. 1285), but the publication must be foreseeable. (*Davis, supra*, 29 Cal.App.4th at p. 373.)

21

The presumed injury is no less damaging because the plaintiff was compelled to make the statement instead of the employer making it directly to the third party.[5]

Allstate offers several other arguments for why we should not accept a theory of compelled self-published defamation. Allstate argues a theory of self-publication undermines at-will employment, which allows companies to discharge employees capriciously, as long as the decision is not unlawful. Allstate also argues that permitting this cause of action may have a chilling effect on communication between an employer and employee, reducing the free flow of information due to self-censorship. Next, Allstate argues this theory of defamation incentivizes an employee to spread defamatory statements instead of mitigating damages. Finally, Allstate notes that employment is primarily a contractual relationship. These arguments do not persuade us to alter our conclusion here.

These same arguments could be offered to support the elimination of a defamation cause of action against employers altogether—the crux of Allstate's argument is that because the employee controls whether a statement is repeated to a third party, the risks of an end-run around the at-will employment doctrine is greater. But the additional requirements of proving a strong compulsion, the necessity to disclose the statement, and the foreseeability of the repetition all contribute to discouraging

---

[5] While defamation per se does not require a finding of actual damages (*Contento*, *supra*, 28 Cal.App.3d at pp. 357-358), in this case, the jury found that Tilkey suffered actual damages of $1,586,185 for harm to his profession or occupation, $111,000 for harm to his reputation, and $5,730 for shame, mortification, or hurt feelings.

employees from simply repeating the defamatory information instead of mitigating their damages. (See *Live Oak Publishing*, *supra*, 234 Cal.App.3d at pp. 1284, 1285.)

Allstate argues only one published case has permitted a compelled self-publication claim to survive summary judgment, and that case, *McKinney*, relied on out-of-state cases with unique facts, implying it should not supply a basis for our conclusion. However, the facts of the cases discussed in *McKinney* are not so different from the one before us now.

In *Colonial Stores, Inc. v. Barrett* (Ga.Ct.App. 1946) 38 S.E.2d 306, 307-308, the plaintiff received a restricted statement of availability that prevented him from being hired by other employers, and he claimed that statement contained a false reason for his termination. There, the employee was required to share the statement with prospective employers. (*Ibid.*) In *Grist v. Upjohn Company* (Mich.Ct.App. 1969) 168 N.W.2d 389, 405-406, the employer disclosed to a prospective employer the reason for termination, compelling the employee to repeat the reason so he could refute it. Allstate argues that because no one at Allstate made a nonprivileged disclosure of its reason for terminating Tilkey's employment to prospective employers, his situation is not analogous. We disagree. Allstate provided a written explanation for Tilkey's termination of employment on the Form U5 to FINRA, which was available to every prospective employer of similarly-licensed employees. As we explain *post*, that disclosure was not absolutely privileged. Thus, Tilkey was compelled

to explain the reason for his discharge, and this repetition was reasonably foreseeable.

We are also not persuaded by Allstate's remaining arguments. Nothing about compelled self-published defamation limits an employer's right or ability to terminate employment unfairly or capriciously. (See *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 350-351.) And because a defamation cause of action does not arise from an employer's statement to the employee of the reasons for termination of employment unless they include false accusations of criminal conduct, lack of integrity, dishonesty, incompetence, or reprehensible personal characteristics or behavior (see, e.g., *Jensen v. Hewlett-Packard Co.* (1993) 14 Cal.App.4th 958, 964-965 [employee performance evaluation]; see, e.g., *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 440 [employer statements about reasons for terminating another employee are generally privileged because of common interest in protecting workplace from abuse]), there is no additional chilling effect on the free flow of information between the employer and the employee.

Additionally, the qualified privilege that attaches to communications about an employee's job performance when made without malice or abuse to a third party likewise protects an employer against compelled self-published defamation. (See Cal. Civ. Code, § 47, subd. (c); *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363 [malice required for application of conditional privilege]; *Neal v. Gatlin* (1973) 35 Cal.App.3d 871, 877 ["It is well established that a former employer may properly respond to an inquiry from a prospective employer concerning an individual's fitness for employment, and if it is not done maliciously, such

24

response is privileged"].)  This conditional privilege helps protect the free flow of reference information.  (*Noel*, at pp. 1373-1374.)

## *Form U5 Privilege*

In its petition for rehearing, Allstate questioned our understanding of the purpose and role of the Form U5.  We have reviewed the materials provided by both parties, and our conclusion on this topic remains the same.  When the information provided in the Form U5 is not made in anticipation of or designed to prompt an official proceeding, it is not protected by an absolute privilege.

Civil Code section 47, subdivision (b) confers an absolute privilege to any communication " '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [have] some connection or logical relation to the action.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.)  The communication must be reasonably relevant to the subject matter of the action for privilege to apply.  (*Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, 148.)

Additionally, the "privilege extends to communications intended to report wrongdoing or trigger an investigation." (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 282 (*Hawran*).)  "[T]he critical question is the *aim* of the communication, not the forum in which it takes place.  If the communication is made 'in anticipation of or [is] designed to prompt official proceedings, the communication is protected.' " (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 368 (*Hagberg*).)  We look to the aim of the Form U5 and the role of FINRA to evaluate whether a statement was made as part of, or

anticipation of an official proceeding.[6]  (See *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 732 (*Fontani*), disapproved of on other grounds in *Kibler v. Northern Inyo County Local Hospital District* (2006) 39 Cal.4th 192.)

Firms are required to file a Form U5 with FINRA whenever a registered representative leaves the firm.  If the registered representative's employment has been terminated, the form asks the firm to provide a reason for termination.  When the Form U5 identifies allegations of improper conduct by a broker-dealer, an issue that FINRA may need to investigate, it can on those occasions be considered "a communication made 'in anticipation of an action or other official proceeding.'  (*Briggs* [*v. Eden Council for Hope & Opportunity* (1999)] 19 Cal.4th [1106,] 1115.)"  (*Fontani, supra,* 129 Cal.App.4th at p. 732.)  In those instances, the information reported on the Form U5 would be protected by the absolute privilege outlined in Civil Code section 47, subdivision (b).[7]  (See *Fontani*, at p. 734.)

---

[6]      FINRA is a non-profit organization that works under the supervision of the Securities and Exchange Commission.  (*FINRA,* <https://www.finra.org/#/> [as of Oct. 26, 2020] archived at <https://perma.cc/E3FW-5NKS>.)  It is "authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly."  (About *FINRA,* <https://www.finra.org/about> [as of Oct. 26, 2020] archived at <https://perma.cc/7NS8-AR4X>.)

[7]      In *Fontani*, Wells Fargo stated on the Form U5 that Fontani misrepresented information when selling annuities.  (*Fontani, supra,* 129 Cal.App.4th at pp. 725-726.)  The appellate court noted that an "investigation is at least one potential consequence of a Form U-5 filing *that contains allegations of improper conduct by a broker-dealer.*"  (*Id.* at p. 731, italics added.)  For that reason, it was a communication made in anticipation of an official proceeding.  (*Id.* at p. 732.)

Allstate explains the Form U5 is used for a variety of purposes, including to identify and sanction misconduct, to make informed licensing and registration decisions, and to ensure the public can make informed decisions about hiring FINRA-registered representatives to manage portfolios.  Indeed, FINRA's "rules and guidance strive to protect the investors and ensure the integrity of today's rapidly evolving market." (*FINRA Rules & Guidance,* <https://www.finra.org/rules-guidance> [as of Oct. 26, 2020] archived at <https://perma.cc/QNL5-5NE6>.)  To that end, FINRA "investigates potential securities violations and, when appropriate, brings formal disciplinary actions against firms and the associated persons." (*FINRA Rules & Guidance Enforcement,* <https://www.finra.org/rules-guidance/enforcement> [as of Oct. 26, 2020] archived at <https://perma.cc/44E6-GBTB>.)  Those disciplinary actions are based on FINRA's rules, which cover a variety of topics related to business activities of registered representatives and member firms.  (See, e.g., FINRA Rule 2010, <https://www.finra.org/rules-guidance/rulebooks/finra-rules/2010> [as of Oct. 26, 2020] archived at <https://perma.cc/A2E5-GUNY> [commercial honor and principles of trade]; FINRA Rule 2020 <https://www.finra.org/rules-guidance/rulebooks/finra-rules/2020> [as of Oct. 26, 2020] archived at <https://perma.cc/PQ74-DE8M> [use of manipulation of fraudulent devices]; FINRA Rule 2100, <https://www.finra.org/rules-guidance/rulebooks/finra-rules/2100> [as of Oct. 26, 2020] archived at <https://perma.cc/CL8F-2SZN> [transactions with customers]; FINRA Rule 4500 et seq., <https://www.finra.org/rules-guidance/rulebooks/finra-rules/4510> [as of Oct. 26, 2020] archived at <https://perma.cc/6YL8-FW3W> [books, records and reports].)

To the extent the Form U5 provides information related to FINRA's enforcement of its rules, the statements are protected. However, the scope of FINRA's authority is not unlimited. Section 7 of the Form U5 includes a list of disclosure questions for full terminations that asks if the terminated employee was the subject of a governmental investigation; was under internal review for fraud, wrongful taking of property, or violated investment related laws, regulations, or industry standards relating to compliance; was convicted of or pled guilty to a felony; or was convicted of or pled guilty to a misdemeanor that related to investments, fraud, false statements, bribery, perjury, forgery, counterfeiting, extortion, or wrongful taking of property. These questions make clear that FINRA seeks termination information that allows it to assess whether the employee's conduct lacked compliance with regulatory requirements in the securities arena. The explanation required in section 3 of the form helps FINRA determine whether and in what ways an employee may have engaged in unethical behavior or otherwise violated FINRA rules.

Thus, the absolute privilege extends to communications required by FINRA, i.e., fraud- and securities-related information and other information covered by its rules. However, the communication of Tilkey's termination here did not regard improper business activities, and Allstate did not limit its responses to such information. Instead, Allstate explained Tilkey's departure was the result of a "termination of employment by parent property and casualty insurance company after allegations of engaging in behavior that are in violation of company policy, specifically, engaging in threatening behavior and/or acts of physical harm or violence to any person, regardless of whether he/she is employed by Allstate. Not securities related." This statement did not contain allegations of improper

28

securities conduct, theft, or allegations or charges of fraud or dishonesty. It was not offered in anticipation of or to initiate an investigation; nor was it offered in the course of any other official proceeding. (See Civ. Code, § 47, subd. (b).)

Allstate also argues that even if FINRA only initiates disciplinary matters in response to terminations issued under FINRA rules, the Form U5 is still protected by absolute privilege because the Form U5 is itself an official proceeding. The cases Allstate cites to support this interpretation are distinguishable. *Fontani* concluded statements that alleged improper business conduct on the Form U5 were protected because an investigation was a possible consequence, making the allegations ones brought in anticipation of an official proceeding. (*Fontani*, *supra*, 129 Cal.App.4th at pp. 731-732.) *O'Shea v. General Tel. Co.* (1987) 193 Cal.App.3d 1040, 1048, did not address the Form U5. There, statements made during a background investigation conducted as required by state law were connected to the investigation about the applicant's moral character. While Allstate is correct that these are examples of privileged statements in anticipation of or as part of investigations, neither supports the conclusion that the Form U5 is itself an official proceeding.[8] Even recognizing, as we do, that an absolute privilege extends to communications related to official proceedings (*Laker*, *supra*, 32 Cal.App.5th at p. 765), in this context, that means the absolute

---

[8] Allstate's references to *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745 (*Laker*) and *Nelson v. Tucker Ellis LLP* (2020) 48 Cal.App.5th 827 (*Nelson*) are also unhelpful. In *Laker,* the challenged statements were made during an ongoing investigation. (*Laker*, at p. 766.) In *Nelson*, the statements were submitted during a judicial proceeding in response to a subpoena; they were related to the issue over which there was litigation, and they were released by the holder of the privilege. (*Nelson*, at pp. 847-848.)

29

"privilege extends to communications intended to report wrongdoing or trigger an investigation" (*Hawran, supra*, 209 Cal.App.4th at p. 282, citing *Hagberg, supra*, 32 Cal.4th at p. 368), and Allstate here was not intending to report wrongdoing or trigger an investigation by FINRA.

Finally, Allstate maintains that the information provided on the Form U5 is connected to an official proceeding because FINRA plays a disciplinary role over employment-related conduct.  Allstate offers two FINRA rules to support this claim, but neither addresses workplace disputes that do not also impact the business activities of the member.  Specifically, FINRA Rule 2010, which falls under the umbrella of "standards of commercial honor and principles of trade," expressly references the member's behavior "in the conduct of its business" and cross-references other rules that focus on commercial business practices, like filing of misleading information, restrictions on the purchase and sale of initial equity public offerings, and prohibiting trading ahead of customer orders.  (FINRA Rule 2010, <https://www.finra.org/rules-guidance/rulebooks/finra-rules/2010> [as of Oct. 26, 2020] archived at <https://perma.cc/A2E5-GUNY>.)  Similarly, the anti-intimidation rule, FINRA Rule 5240, which falls within rules regarding "quotation and trading obligations and practices" prohibits engaging in conduct that "threatens, harasses, coerces, intimidates or otherwise attempts improperly to influence" another person or member.  Subsequent language in that section explains the rule includes, but is not limited to, attempting to influence another person or member "to adjust or maintain a price or quotation," a commercially-related concern.  (FINRA Rule 5240, <https://www.finra.org/rules-guidance/rulebooks/finra-rules/5240> [as of Oct. 26, 2020] archived at <https://perma.cc/RXC9-B6X3>.)  These rules do not

persuade us that FINRA's regulatory and disciplinary authority includes all employment-related conduct.

Neither do the examples of disciplinary matters offered by Allstate in its request for judicial notice. Those matters involved situations in which the former employees had allegedly engaged in improper business activities, including misappropriating customer funds, harassing and threatening employees to secure leverage for post-employment commissions, making unauthorized transactions, converting firm funds, violating sales practices, and committing fraud. Thus, FINRA was exercising its authority under its rules.

We recognize there are adjudications via arbitration that raise defamation issues, including defamation arising out of the Form U5. (*Top 15 Controversy Types in Intra-Industry Arbitrations, FINRA Dispute Resolution Statistics,* <https://www.finra.org/arbitration-mediation/dispute-resolution-statistics#top15controversyindustry> [as of Oct. 26, 2020] archived at <https://perma.cc/98DA-VQM7>.) However, FINRA's arbitration provisions are only mandatory for disputes involving customers, or pursuant to a written agreement; there is no requirement that employment disputes be arbitrated or brought to FINRA. (*Ibid;* FINRA Rule 13201, <https://www.finra.org/rules-guidance/rulebooks/finra-rules/13201> [as of Oct. 26, 2020] archived at <https://perma.cc/6JL2-B8W8>; *SEC Approves Rule Change Regarding Arbitration of Statutory Employment Disputes, Notice to Members 98-56,* available at <https://www.finra.org/rules-guidance/notices/98-56> [as of Oct. 26, 2020] archived at <https://perma.cc/8P8W-CWE2>.) In other words, FINRA's jurisdiction over workplace disputes is more contractual than regulatory.

FINRA's disciplinary authority extends to its own rules, which regard business activities of registered representatives and member firms, and statements that aim to prompt an investigation that would result in discipline under those rules are protected. (See Civil Code, § 47, subd. (b); *Hagberg, supra*, 32 Cal.4th at p. 368.) As we have explained, the statement in section 3 here did not relate to Tilkey's business activities or any violation of FINRA Rules and was therefore not protected by an absolute privilege. Although we conclude the Form U5 statement was not absolutely privileged, even were we to have concluded otherwise, it would not preclude a finding that Tilkey was compelled to self-publish a defamatory statement because, as we next explain, there was substantial evidence to support compelled self-publication even without the Form U5.

## C.

### *Substantial Evidence Supports Jury Findings That Tilkey Was Compelled to Self-Publish Statement That Was Not Substantially True*

Finally, Allstate contends Tilkey was not under a strong compulsion to self-publish the defamatory statement and there was not substantial evidence to support the jury's finding the statement was not substantially true. We disagree.

We look for substantial evidence regarding whether Tilkey was compelled to self-publish and whether its statement that he was engaged in threatening behavior and/or acts of physical harm or violence to any person was substantially true. (*Sweatman, supra*, 25 Cal.4th at p. 68.) In so doing, we do not " 'weigh the evidence, consider the credibility of witnesses, or resolve conflicts in the evidence or in the reasonable inferences that may be drawn from it.' " (*Do, supra*, 216 Cal.App.4th at

32

p. 1492.) We consider disputed facts in a light most favorable to the judgment. (*Ibid.*)

## 1. Compulsion

The jury concluded that Tilkey was under strong pressure to communicate Allstate's defamatory statement to another person. There is ample evidence to support this conclusion.

The vocational evaluator testified Tilkey would have a difficult time ever getting another job because he had been terminated, and the reason for termination reported on the Form U5 was negative. He testified that because job applications ask for information about whether the applicant had been terminated from employment, Tilkey would have to explain the situation, and that would be "an absolute killer." He also noted that because Tilkey sold life insurance, he was required to hold securities licenses, and agencies and employers hiring those with securities licenses would have access to U5 forms. Tilkey's supervisor at Allstate, William Vasquez, testified that Allstate routinely reviewed the securities public information from the Form U5 of any person they were hiring, and he could not recall ever hiring anyone at Allstate whose Form U5 stated he was terminated for cause. Tilkey likewise testified that when he recruited agents, he would have someone check the Form U5, and he never hired anyone whose Form U5 showed the termination was for cause. He also never received an interview from any company that had access to a Form U5, even though he had 30 years of experience and performed well, receiving the third largest bonus in the state just a few weeks before his termination. Tilkey's knowledge of how companies used the Form U5, coupled with Allstate's related hiring practice contributed to his

compulsion to explain and respond to the allegation. (See *Live Oak Publishing*, *supra*, 234 Cal.App.3d at p. 1285 [compulsion from need to explain to employers who will learn of allegation if they investigate past employment].)

Even without reference to the Form U5 specifically, there is substantial evidence that Tilkey was compelled to disclose Allstate's reason for terminating his employment. Tilkey looked for work in other fields as well, but even then he was asked about whether he had been terminated from a job. He answered the question honestly, stating that Allstate alleged he had engaged in threatening behavior and/or acts of physical harm or violence to another person, then countered it by explaining he had never threatened anyone. (See *Beroiz*, *supra*, 84 Cal.App.4th at p. 497 [republication necessary to disprove accusation].)

None of these facts is disputed. Taken together, in a light most favorable to the verdict, the implication is evident. Even if the company never offered any specific information about the reason for Tilkey's discharge from employment to prospective employers, its statement at the time of discharge and separately its reporting of the information on the publicly-available Form U5 necessitated Tilkey's self-publication in other settings. Without explaining Allstate's claims, Tilkey would not have been able to explain his employment history and sudden departure after 30 years.

## 2. Substantial Truth

The truth of a statement is an absolute defense against civil liability. (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1180.) The defendant does not need to prove the literal truth of

every word in the challenged statement; the defense is complete "so long as the imputation is substantially true so as to justify the 'gist or sting' of the remark." (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 582 (*Campanelli*).)

The jury was asked whether Allstate stated, "[Tilkey] engaged in threatening behavior and/or acts of physical harm or violence to another person," and it concluded Allstate did. The jury also found the statement was not substantially true. These conclusions are supported by substantial evidence.

The facts of the evening of Tilkey's arrest, which formed the basis of Allstate's conclusion that he engaged in threatening behavior and/or acts of physical harm or violence, are largely undisputed. Tilkey and Mann were at Mann's one-bedroom apartment after an evening out when they began to argue. Tilkey stepped onto the enclosed patio, and Mann closed and locked the door behind him. Tilkey banged on the door loudly, demanding to be let into the home to gather his belongings from the room where Mann's grandson was asleep. When police arrived, Mann told them she was afraid Tilkey would wake her grandson, and the interior trim on the framing of the patio door was broken. Tilkey was arrested for misdemeanor criminal damage deface and disorderly conduct - disruptive behavior, and a domestic violence label was attached to the disorderly conduct charges. Tilkey pled guilty to disorderly conduct fighting (DV).[9]

---

9    In its petition for rehearing, Allstate contends certain facts that Tilkey admitted to were omitted from our opinion. The first two sets of facts Allstate identifies were related to Tilkey pounding on the door, the door frame being broken, and Tilkey's possession of marijuana paraphernalia. Those facts were included in our initial opinion, as they are now. The third

These facts do not include evidence that Mann was ever directly threatened; nor do these events indicate that Tilkey was threatening to physically harm Mann or her grandson. Tilkey's attorney explained that the charges did not reflect threats of violence or harm. Estrada testified that A.R.S. section 13-2904A.1, the charge to which Tilkey pled guilty, defines the crime as engaging in fighting, violent, or seriously disruptive behavior. The basis of Tilkey's guilty plea was his admission that he engaged in seriously disruptive behavior on the date, time, and location listed in the charges against him. Estrada explained that while the court-generated guilty plea form references fighting, the departmental report and his understanding were that the conduct was disruptive behavior and not fighting, which is why the departmental report listed "disruptive behavior" on it. Estrada also testified that there is a separate charge for threatening behavior, A.R.S. section 13-1202, for which Tilkey was not

fact Allstate highlighted, that Tilkey had been drinking, was not included because there was no evidence or argument that the information was relevant to the outcome of the case.

Allstate further contends in its petition for rehearing that our statement of facts is inaccurate because we did not include reference to testimony about whether Tilkey broke the door and whether Tilkey told Mann he would pay for repairs to the door. Although Allstate does not explain why these "omitted" or "inaccurate" facts should be added, we presume Allstate asks us to include them because it believes this information supports its statement that Tilkey "engaged in threatening behavior and/or acts of physical harm or violence to another person." But these factual details do not support the statement, as the jury ultimately found. Breaking a door frame to enter the home to retrieve belongings, if that is what happened, is not synonymous with threatening behavior or acts of harm or violence to another person. And although Tilkey agreed to pay Mann for repairs to the door, offering to pay for the door without admitting he caused the damage is not evidence that he threatened or harmed her. Even if it were, the standard of review on this point is whether there is substantial evidence to support the judgment that the statement was false, and there is.

charged. Tilkey similarly testified that he agreed to enter a diversion program because he felt like he was guilty of making noise that night.

Additionally, Alferos's summary of her investigation into the arrests initially concluded Tilkey was not in violation of company policy. It was only after her supervisor Burno directed her to revise the summary of investigation that Alferos concluded Tilkey's behavior "may [have been] at a level which causes management to lose confidence in his ability to work at Allstate." When Burno modified the conclusion again later, he relied on the retained charge against Tilkey to conclude "Tilkey engaged in behavior that was construed as acts of physical harm and violence towards another person." And Alferos's termination request form stated that based on Tilkey's voluntary entrance into the diversion program, he had engaged in acts of physical harm or violence to another person. But Estrada's testimony made clear that a domestic violence label does not mean the person engaged in physical violence or even threatened violence.

Thus, there is substantial evidence that the events of August 16, 2014, do not support Allstate's statement, especially when construed in a light most favorable to the jury verdict. Tilkey and his girlfriend had a heated exchange during which there was shouting, a door slam, and banging on the door. The charge to which Tilkey initially pled guilty was a disorderly conduct charge, not a threat charge. And while there was a factual basis for that guilty plea, disorderly conduct does not require any physical violence or threat of physical violence, so the existence of that charge is not sufficient on its own to conclude Tilkey engaged in physical harm or threatened physical harm. The factual basis for the plea was disruptive behavior, not physical harm, or even threat of physical harm.

37

Finally, Tilkey explained that he entered the diversion program because he felt like he was guilty of making noise that night.

The "gist or sting" of Allstate's remarks was that Tilkey behaved in a physically violent or threatening manner, and that was why his employment was terminated. (See *Campanelli*, *supra*, 44 Cal.App.4th at p. 582.) But the facts do not point to Tilkey threatening Mann, physically harming her, or being violent. Thus, there is substantial evidence to support the jury's verdict that Allstate's statement to the contrary was not substantially true, and we will affirm.

## III.

## PUNITIVE DAMAGES

Allstate presents four arguments for why the judgment on punitive damages should be reversed: (1) no managing agent acted to terminate Tilkey with knowledge of violating section 432.7 or with knowledge of or a reckless disregard for the truth; (2) Allstate did not consciously disregard the requirements of section 432.7; (3) punitive damages are not available in compelled self-publication defamation matters; and (4) the award is excessive in violation of due process rights. Having already concluded Allstate did not violate section 432.7, we do not address Allstate's contentions relating to that section of the Labor Code. We address the remaining three contentions in turn below.

## A.

### *Standard of Review*

We review whether a punitive damages award is constitutionally excessive de novo, independently assessing the "reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil

penalties authorized for comparable conduct." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*).)

We likewise review denial of a motion for JNOV de novo. (*Linear Technology Corp. v. Tokyo Electron Ltd.* (2011) 200 Cal.App.4th 1527, 1532) " '[W]e determine whether substantial evidence supported the verdict, viewing the evidence in the light most favorable to the party who obtained the verdict. [Citation.] We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the verdict, and do not weigh the evidence or judge the credibility of witnesses.' " (*Ibid.*; *Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 890.)

B.

*Managing Agents Acted with Reckless Disregard*

We first turn our attention to whether managing agents knew the reason given for termination was not substantially true and whether they acted with reckless disregard for the truth.

For punitive damages, the plaintiff must prove by clear and convincing evidence that the defendant acted with "oppression, fraud, or malice" and that those acts were performed or ratified by an "officer, director or managing agent." (Civ. Code, § 3294, subds. (a), (b); *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 726.) A company ratifies a managing agent's decision when it knows about and accepts the decision. (*Ibid.*; *Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 168.)

The term "managing agent" includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566-567 (*White*).) It does not depend on the person's level within the corporate

39

hierarchy but instead the amount of discretion permitted in making decisions. (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 886, quoting *Kelley-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 421.) Moreover, a managing agent does not need to be a corporate policymaker and can formulate operational policies through discretionary decisions. (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 452-453 (*Colucci*).) The scope of an employee's discretion and authority is a question of fact. (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 366.)

"The reckless disregard test is not a negligence test measured by whether a reasonably prudent person would have published, or would have investigated before publishing, the defamatory statement." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 114.) Instead, a reckless disregard for truth or falsity is demonstrated when there is " 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication,' " but published the statement anyway. (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 846-847.) This may be demonstrated through circumstantial evidence, including a failure to investigate, anger and hostility toward the plaintiff, or reliance on unreliable sources. (*Id.* at p. 847, quoting *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 258.)

In its petition for rehearing, Allstate reiterates its argument that the decisionmaker here was not a managing agent. We remain unpersuaded.[10] Burno was the director of HR, and employees including Alferos reported directly to him. Allstate argues Burno's job title and role as a supervisor do not establish that he is a managing agent. Although Burno's hiring and firing authority is not sufficient in itself to characterize him as a managing agent (*White*, *supra*, 21 Cal.4th at p. 566), in his role overseeing the centralized staff who investigated complaints, he helped guide the application of company policy. The vice president of HR explained that when judgment was required, as in cases that were not straightforward like attendance issues, the manager would make the decisions about discipline. In so doing, Burno formulated operational corporate policy at least related to discipline and attendance. (See, e.g., *Colucci*, *supra*, 48 Cal.App.5th at p. 452 [explaining a district manager's discretionary authority over daily store operations like disciplinary measures, investigations, and employee transfers, led to the "ad hoc formulation of policy"].)

Moreover, Burno exercised independent authority and judgment in his handling of this particular matter, directing Alferos to change her conclusion,

_____

[10] We note that Allstate highlighted several "omitted" facts regarding this issue. One was that Burno was a lower level manager, under Metzger and Harty, information evident from our discussion, noting that Burno was a director, Metzger was the vice president of HR, and Hardy was the president and head of HR. The other items identified, the number of employees Burno supervised and how HR fit within the larger corporate structure, are not facts we omitted; they are facts that were not presented at trial. This information, while potentially helpful, is not necessary to our determination.

Allstate also contends no evidence was introduced that Burno exercised substantial discretionary matters on matters that dictated corporate policy. As we explain, we disagree with that assessment.

41

then altering the conclusion himself later and ultimately deciding whether company policy prohibited the behavior in which Tilkey had engaged. Burno's decision that Tilkey's behavior was at a level that caused management to lose confidence in his ability to work for the company, when none of Tilkey's direct managers expressed any concern, is further evidence that Burno's judgment was forming corporate policy about what behavior was acceptable and how it would be disciplined. Burno's day-to-day work required the exercise of independent authority and judgment, making him a managing agent.

Even if Burno were not a managing agent for Allstate, other managing agents, Metzger and Harty, ratified the decision. Although Metzger framed the termination decision as Burno's, other evidence suggests there was collective agreement by other managing agents, and thus ratification, of the decision. Metzger testified that she was involved in high-profile cases and unique situations, counseling Burno and serving as his sounding board. She "fully supported" Burno's decision, and she talked it through with several "very high-level managers at Allstate," including Harty, who was the head of HR for the company. In their communications, Metzger and Harty expressed concern about Tilkey's conduct and whether he should continue to serve as a face of Allstate. The executive vice president and the president of HR knew about and supported the decision to terminate Tilkey before his discharge; they had discussions about it, and they reviewed the paperwork in advance.

Allstate argues that managing agents did not act with malice because Metzger did not personally gather any information or see the version of the summary of investigation that concluded there was no violation of company policy, and because she testified that she considered Tilkey's behavior to be threatening. This argument ignores that Burno, who supervised the

42

investigation from the outset, was a managing agent, and Burno's actions demonstrate a conscious disregard. He directed Alferos to change her conclusion to justify terminating Tilkey's employment for loss of confidence in him. Then he changed the conclusion completely to say Tilkey had "engaged in behavior that was construed as acts of physical harm and violence towards another person" without information that Tilkey had, in fact, engaged in physical harm or violence. Metzger was aware of this change. Moreover, no one from Allstate ever interviewed Mann or looked into her background, even though it was her e-mails that prompted the internal investigation. Allstate's reliance on the testimony of Metzger to challenge the finding as one she made in earnest is self-serving, and testimony which the jury and trial court found not credible. (See *People v. Maciel* (2013) 57 Cal.4th 482, 519 [trial judge or jury determines credibility of witness and truth or falsity of facts upon which determination depends].)

## C.

### *Availability of Punitive Damages*

Allstate asks us to follow a Minnesota Supreme Court case, *Lewis v. Equitable Life Assurance Soc.* (Minn.S.Ct. 1986) 389 N.W.2d 876 (*Lewis*) to conclude punitive damages are unavailable in compelled, self-published defamation cases, noting no California cases have expressly addressed this issue. Tilkey contends that California law permits punitive damages for defamation, and compelled self-publication is not less worthy of the same punishment. We agree with Tilkey.

In *Lewis*, a group of employees were discharged for "gross insubordination" after refusing to alter their expense reports following a business trip for which their work was commended. (*Lewis*, *supra*, 389 N.W.2d at pp. 880-882.) The company failed to provide expense

43

guidelines, then offered differing instructions after the employees returned from the business trip, each time asking the employees to adjust their accounting and to repay the company the difference. (*Id.* at pp. 881-882.) The employees who refused to do so were terminated for gross insubordination and denied severance pay. (*Id.* at pp. 881-882.)

The company's policy was to give only the dates of employment and final job titles of former employees unless specifically authorized in writing to release additional information. (*Lewis*, *supra*, 389 N.W.2d at p. 882.) Despite this, at least once, each employee stated the reason for termination and attempted to explain the situation in subsequent job applications. (*Ibid.*) The Minnesota Supreme Court recognized for the first time the validity of a compelled self-publication defamation cause of action. (*Id.* at p. 888.) However, it declined to permit punitive damages because it was concerned that their availability could encourage employees to publish the defamatory statements by employers, deterring employer communication of the reason for the employee's discharge to the employee. (*Id.* at p. 892.)

We reach a different conclusion here. First, punitive damages are available in cases where the trier of fact finds slander per se. (See *Manguso v. Oceanside Unified School Dist.* (1984) 153 Cal.App.3d 574 [libel per se]; *Contento, supra,* 28 Cal.App.3d at p. 359.) The slander here was self-published, but that does not change access to punitive damages. To be successful with compelled self-publication defamation, a plaintiff already must prove a necessity and a strong compulsion to disclose the statement, and the employer must be able to reasonably anticipate the self-publication. (*Beroiz, supra,* 84 Cal.App.4th at p. 497; *Davis, supra,* 29 Cal.App.4th at p. 373; *McKinney, supra,* 110 Cal.App.3d at p. 796.) The plaintiff also must demonstrate that he actually published the statement. (*Dible v. Haight*

44

*Ashbury Free Clinics* (2009) 170 Cal.App.4th 843, 851; *Live Oak Publishing Co., supra,* 234 Cal.App.3d at p. 1285.)  As we discussed *ante*, these requirements mean a plaintiff cannot simply manufacture a defamation claim.

Moreover, the focus for punitive damages is not the plaintiff's repetition of the defamatory statement to a prospective employer, but the employer's intent.  To recover pecuniary damages, the plaintiff must prove by clear and convincing evidence that an employer has acted with malice, oppression, or fraud.  (Civ. Code, § 3294, subds. (a), (b), & (c).)  An affirmative finding on malice or oppression demonstrates that the jury has concluded the plaintiff proved the defendant "acted with the requisite reprehensible motivation . . . thereby defeating the qualified privilege" and also that the "defendant['s] conduct was also intentionally injurious to, or in conscious disregard of, plaintiff's rights, thereby meeting the *heightened* requirements of malice (or oppression) necessary to support an award of punitive damages." (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1214, citing Civ. Code, § 3294, subd. (c)(1) & (2) [discussing prejudicial error after concluding plaintiff bears the burden of proving malice].)  Collectively, these additional elements and heightened burden of proof already provide a safeguard against the plaintiff self-publishing defamatory statements just so he or she can sue a former employer.  If the employee were not already encouraged to repeat the defamatory statements because of the availability of a cause of action for compelled self-defamation, we fail to see how the additional burdens created by the need to also prove the defendant's motive by clear and convincing evidence, even in light of potentially increased recovery, increases the likelihood that a plaintiff would bring a defamation lawsuit.

We note, too, there are some factual differences between *Lewis* and the matter before us. Chief among them is the company policy in *Lewis* not to disclose more than a former employee's dates of employment and final job title. (See *Lewis*, *supra*, 389 N.W.2d at p. 882.) Although the court there ultimately found there was a viable compelled self-publication cause of action (*Id.* at p. 888), this type of fact would tend to cut against the requirement that self-publication be foreseeable (*Beroiz*, *supra*, 84 Cal.App.4th at p. 497; *Live Oak Publishing*, *supra*, 234 Cal.App.3d at p. 1285). In contrast, here the evidence that the self-publication was compelled, necessary, and foreseeable was strong: Allstate published the statement on the Form U5, which was available to all firms that hired licensed broker-dealers; the jobs to which Tilkey applied included such jobs, and employers, including Allstate, routinely reviewed that information before hiring an individual. This was not a situation where the availability of the statement to prospective employers was questionable; Tilkey's disclosure of the allegation was already in the public sphere, necessitating its repetition to challenge its veracity. Even with an explanation of his situation, the allegation would be, as the vocational expert explained, "an absolute killer."

D.

*Constitutionality of Punitive Damages*

Allstate contends the punitive damages award violates due process because the large ratio between punitive damages and compensatory damages, a ratio greater than six to one, is disproportionate and far exceeds civil penalties for the same violation. We agree.

"Appellate courts conduct de novo review of a trial court's application of the guideposts to the jury's punitive damage award." (*Nickerson v. Stonebridge Life Insurance Co.* (2016) 5 Cal.App.5th 1, 15 (*Nickerson*).) Three

46

factors determine whether punitive damages are excessive:  (1) degree of reprehensibility of the defendant's misconduct; (2) disparity between actual or potential harm suffered and the pecuniary award; and (3) the difference between the punitive damages award and comparable civil penalties.[11] (*Simon, supra*, 35 Cal.4th pp. 1171-1172; *State Farm Mutual Auto Insurance Co. v. Campbell* (2003) 538 U.S. 408, 418 (*State Farm*); *Major v. Western Home Insurance Co.* (2009) 169 Cal.App.4th 1197, 1222-1223 (*Major*).) Because the parties agree there are no corresponding civil penalties for the defamation, we consider only the first two factors.

1.  Reprehensibility

The degree of reprehensibility is the most important indication of the reasonableness of the defendant's conduct.  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 713 (*Roby*); *Nickerson, supra*, 5 Cal.App.5th at p. 16.)  Courts consider five factors for assessing the degree of reprehensibility:  (1) physical harm; (2) indifference or reckless disregard for health or safety of others; (3) whether target was financially vulnerable; (4) if the conduct was repeated or isolated; and (5) if the conduct was intentional or accidental.  (*Major, supra*, 169 Cal.App.4th at p. 1223, citing *State Farm, supra*, 538 U.S. at p. 419; *Simon, supra*, 35 Cal.4th at p. 1180.)

---

[11]    The parties do not clearly parse out these factors with attention to each cause of action separately.  Because we conclude the company's termination was not wrongful, damages should be limited to those resulting from the defamation cause of action, and we have attempted to so limit our review here.  We are cognizant that the jury concluded the reason provided for Tilkey's termination, while not unlawful under section 432.7, was nonetheless not substantially true and was defamatory.  Accordingly, we view the emotional distress that arose from defamation as the basis for punitive damages in this case.

Harm is physical when it affects emotional and mental health and is not purely economic. (*Roby*, *supra*, 47 Cal.4th at p. 713.) Tilkey testified that he endured weight gain, bouts of crying, loss of sleep, physical tension, and tightness in his chest. Thus, there was evidence that he suffered physical symptoms from emotional distress. (See *Nickerson*, *supra*, 5 Cal.App.5th at p. 17.) It is not clear from the record whether these physical manifestations were the result of his termination, the defamatory statement, or a combination of the two. However, the jury awarded separate amounts for emotional distress damages tied to wrongful discharge and for shame, mortification, or hurt feelings tied to defamation, suggesting distress from each action. It is not possible to separate out the physical manifestations of the distress resulting from the discharge from the shame, mortification, or hurt feelings resulting from the defamation, but it is clear this factor weighs in favor of a finding of reprehensibility.

Allstate argues that the second factor is not supported because Allstate was motivated by concerns about the health and safety of others, by enforcing its policy prohibiting threats of violence against any person. This interpretation of the facts presented relies on the conclusion that Tilkey's actions constituted a threat of violence against another person, a conclusion with which the jury disagreed in light of its finding that the statement was not substantially true. Instead, the trial court viewed Allstate's motivations as concerned more with its own reputation than ascertaining the truth. This conclusion, again, is supported by the evidence outlined in greater detail *ante*.

With respect to the third factor, Allstate argues that Tilkey's only financial vulnerability was that his employment was terminated, making him no different than any other person who lost a job. Tilkey was different than

the typical employee because he relied on the company-issued cell phone and car for his everyday use. However, this evidence, as well as evidence of his 30-year career with Allstate, is only relevant if Tilkey's termination were wrongful. Having previously concluded it was not, we focus on financial vulnerability with respect to the defamatory statement Allstate made. As the trial court mentioned, the circumstances of Tilkey's termination precluded him from finding future employment and forced him to live off his "dwindling 401K" without job prospects, in part because Allstate blocked him from accepting lucrative jobs. In some sense, Tilkey's long-standing professional relationship with Allstate made him dependent on the company's recommendation for future employment, making Allstate's description of his behavior as threatening or causing physical violence against another particularly damaging for future job prospects. Allstate points out Tilkey earned an average of $200,000 annually, had savings, and was awarded compensatory damages. Perhaps Tilkey's savings meant he was not as financially vulnerable as someone without. This factor is close but probably weighs slightly against supporting a finding of reprehensibility.

Finally, although Allstate contends its conduct was a one-time event, a statement offered only at the time of Tilkey's termination meeting, this ignores its defamatory statement on the Form U5, which could be repeatedly accessed by third parties, and it ignores Tilkey's need and strong compulsion to repeat the statement, even to companies that could not access the Form U5. These additional acts, for which Allstate is responsible, weigh in favor of finding its action reprehensible.

Although the fifth factor is of little consequence because acts must be intentional to qualify for punitive damages, (*Major*, *supra*, 169 Cal.App.4th at p. 1223, quoting *Simon*, *supra*, 35 Cal.4th at p. 1181), we address it here

49

briefly to note the jury's determination that the statement was not substantially true indicates some intentionality on the part of the company. (*Roby*, *supra*, 47 Cal.4th at p. 716 [jury award of punitive damages requires finding malice, fraud, or oppression].)  Metzger testified that she sincerely believed Tilkey's admission that he banged on the door to gain access for his personal belongings, the frame of the door was broken, and Tilkey was arrested was sufficient evidence that he engaged in threatening behavior and/or acts of physical harm or violence to another.  The company made this determination without communicating directly with Mann, without seeming to consider that the charge was for disorderly conduct and not threatening behavior, and while recognizing that the decision to discharge Tilkey's employment really could go either way.  After observing the evidence offered at trial, the court concluded Allstate had not made a reasonable effort to determine whether its statement was true, and it explained:  "Allstate's contention that Plaintiff's banging on the door was reasonably interpreted as 'threatening behavior' was not believable."

Our independent review of these factors supports the conclusion that Allstate's defamatory behavior was reprehensible.

2.  Relationship Between Punitive and Compensatory Damages

Punitive damages must bear a "reasonable relationship" to compensatory damages.  (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 580-581; *Little v. Stuyvesant Life Insurance Co.* (1977) 67 Cal.App.3d 451, 469.)  While " 'relatively high ratios could be justified when " 'a particularly egregious act has resulted in only a small amount of economic damages,' " ' " when a jury awards substantial compensatory damages, a lesser ratio can reach the limits of the due process guarantee.  (*Major*, *supra*, 169 Cal.App.4th at p. 1224, quoting *Simon*, *supra*, 35 Cal.4th at p. 1182.)

Although there is no bright line regarding the proper ratio of punitive to compensatory damages, the United States Supreme Court has suggested the ratio should generally be no higher than four to one and almost never nine to one. (*Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 213 (*Gober*), citing *State Farm*, *supra*, 538 U.S. at p. 425.)

The jury awarded Tilkey $960,222 for wrongful discharge and $1,702,915 in actual damages for defamation. The punitive damages award was $15,978,822, a ratio of six times the compensatory damages amount. Even without excluding the damages awarded for wrongful discharge, this ratio strikes us as excessive given the level of reprehensibility here. Without the compensatory damages awarded for wrongful discharge, the ratio is greater than nine to one, a ratio we conclude is constitutionally excessive. (See *Gober*, *supra*, 137 Cal.App.4th at pp. 213, 214.)

In our initial opinion, we explained that because the jury's punitive damages award is not allocated to the various liabilities it found, it is not possible to know how much punishment the jury felt was necessary for the company's defamatory action, which must serve as the basis for the damages in this case. In his request for rehearing, Tilkey argued the jury's compensatory damages award for defamation and Allstate's stipulated net worth of $2.87 billion provide all the required elements for evaluating the appropriate amount of punitive damages and requested a remittitur on the punitive damages issue.[12] There is some authority that doing so is appropriate.

In *Colucci*, a panel of our division issued a remittitur that set a constitutional limit of 1.5-to-one as the ratio between punitive and

---

[12] Tilkey qualifies the request, asking for "at the very least" a conditional remittitur, "provided that Tilkey consents to that remitted amount" and if he does not, then a retrial on the issue of punitive damages.

compensatory damages. (*Colucci*, *supra*, 48 Cal.App.5th at p. 459.) There, the plaintiff successfully sued his employer for wrongful termination based on workplace retaliation and was awarded $1,020,042 in compensatory damages and $4 million in punitive damages. (*Id.* at pp. 449-450.) The court of appeal explained that in practice few punitive damages awards exceed a single-digit ratio when compared to compensatory damages and noted that when compensatory damages are substantial, a lesser ratio of punitive damages may be more appropriate. (*Id.* at p. 458, citing *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 425.) The court concluded that "[g]iven the low to moderate range of reprehensibility of [the company's] conduct here, we conclude that a 1.5-to-one ratio between punitive and compensatory damages is the federal constitutional maximum." (*Colucci*, at p. 459.)

The facts here are similar, although the ratio of compensatory - to punitive damages is much higher, making their excessiveness even more extreme. The jury awarded $1,702,915 in actual damages for defamation, with the largest sum—$1,586,105—allocated to harm to Tilkey's profession or occupation. The jury allocated $5,730.00 to shame, mortification, or hurt feelings, and $111,000 to harm to reputation, which is roughly seven percent of the total award. We do not know from the record if the jury's financial allocation was driven by limited evidence of emotional distress or if this also reflected the jury's assessment of Allstate's reprehensibility. (See *Colucci*, *supra*, 48 Cal.App.5th at p. 459.) However, the act here did not result in only a small amount of economic damages; thus, a lesser ratio of punitive-to-compensatory damages is appropriate to ensure due process. (*Major*, *supra*, 169 Cal.App.4th at p. 1224, quoting *Simon*, *supra*, 35 Cal.4th at p. 1182.)

Accordingly, we will reverse the punitive damages award and remand the matter with directions to enter judgment in the amount of $2,554,372.50, or one and one-half times (1.5) the compensatory damages awarded for defamation.

## IV.

## AFTER-ACQUIRED EVIDENCE

An employer may exercise an after-acquired evidence defense in response to a wrongful termination cause of action. (*McKennon v. Nashville Banner Publ. Co.* (1995) 513 U.S. 352, 362-363.) To establish this defense, the employer must demonstrate the employee engaged in wrongdoing that would have resulted in a termination of employment. (*Ibid.*) This cuts off damages from the date on which the evidence was discovered. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 430.)

Because the company did not violate section 432.7, the after-acquired evidence defense is not relevant. Accordingly, we decline to address this issue.

## DISPOSITION

The order denying Allstate's motion for JNOV regarding wrongful termination for violation of section 432.7 is reversed, and the matter is remanded to the trial court with directions to enter a judgment for Allstate on this cause of action.

We affirm the portions of the judgment finding Allstate liable for defamation and punitive damages. However, the punitive damages portion of the judgment against Allstate is reversed, and the matter is remanded to the trial court with directions to modify the punitive damages award to $2,554,372.50, representing a ratio of 1.5 times the amount awarded in compensatory damages.

The parties shall bear their own costs on appeal.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.